Submitted on brief April 17, modified May 22, 1917.

## MONROE v. WITHYCOMBE.*

(165 Pac. 227.)

Pleading—Demurrer—Admission.

1. For purposes of an appeal, demurrers to the complaint admit the facts pleaded.

Fish—Ownership in State.

2. Fish are *ferae naturae*, and while in a state of freedom their ownership, so far as a right of property can be asserted, is in the state, not as a proprietor, but in its sovereign capacity for the benefit of and in trust for its people in common.

[As to ownership of or property in fish, see note in 131 Am. St. Rep. 751.]

Navigable Waters—Title of State to Land Under Navigable Water—Admission of Territory.

3. On its admission to the Union, Oregon was vested with title to the land under the navigable waters within the state, subject to the public right of navigation, and to the common right of citizens of the state to fish.

Fish—Regulation by State.

4. In the exercise of its police power, and for the welfare of all its citizens, the state can regulate or even prohibit the catching of fish.

Fish—Master Fish Warden—Power.

5. The master fish warden of the state, holding a position created and exercising an authority defined by the legislature, cannot do what the legislature cannot empower him to do.

Constitutional Law—Privileges and Immunities—Exclusive Right to Catch Salmon—Monopolies.

6. In Oregon, the legislature cannot grant to one person an exclusive right to catch salmon at a place and in waters where all citi-

*As to government control over right to fish, see notes in 39 L. R. A. 581; L. R. A. 1916E, 523.

As to right to fish generally, see note in 60 L. R. A. 481.

As to what discrimination as to persons is permissible in fishing laws, see note in 26 L R. A. (N. S.) 794.                REPORTER.

zens have the right to fish, because, when that which belongs equally to all the citizens of the state is taken from all and vested in only one citizen, it is equivalent to transforming a public right into a monopoly, exercisable by only one citizen, and therefore violative of Article I, Section 20, of the Constitution, providing that no law shall be passed granting to any citizen or class of citizens privileges or immunties, which, on the same terms, shall not equally belong to all citizens.

### Constitutional Law—Separation of Powers—Delegation of Legislative Power.

7. There is a large class of cases where the legislature may vest in administrative officers power to determine when particular cases do or do not fall within a competent rule established by the legislature.

### Constitutional Law—Separation of Powers—Delegation of Legislative Power.

8. The legislature may delegate to a board the power to stock a stream with fish and close it against fishing, providing the order is not discriminatory.

### Constitutional Law—Delegation of Legislative Power to Board—Interference by Court.

9. In cases where the legislature may delegate to and vest in an administrative board a power, the courts will not attempt to control or interfere with the judgment and discretion of the administrative officers.

### Constitutional Law—Legislative Power—Delegation.

10. The legislature can neither directly nor indirectly empower a mere administrative board to do that which the legislature itself cannot do.

### Fish—License to Build Fish-traps—Prior Rights—Statute.

11. Under Laws 1913, page 225, providing that it shall be unlawful for the master fish warden or board of fish commissioners to grant a license to any person to build fish-traps in any locality in the Columbia River. when in their judgment the same interfere with a prior right of fishing, etc., the mere issuance by the master fish warden to defendant of licenses to build fish-traps in the Columbia River did not foreclose inquiry into the existence of prior fishing rights at the locality involved in suit by aggrieved persons to prevent the construction of the traps, since the statute makes no provision for a notice or hearing, and makes no attempt to vest the warden with judicial authority, so that the doctrine that courts cannot interfere with the judgment and discretion of administrative officers has no application.

### Constitutional Law—Adjudication of Rights by Officer or Board—Statute.

12. Laws 1913, page 225, construed as an attempt to vest the master fish warden or board of fish commissioners with judicial power to adjudicate constitutional rights, would be unconstitutional to the extent of such an attempt.

Fish—Fish-traps—Confiscation of Piling—Statute.

13.   Though a person licensed to do so by the master fish warden is not entitled to construct salmon traps in the Columbia River or to maintain the piling driven at each of three places, it would be inequitable to command the warden and board of fish commissioners to remove and confiscate the pilings under the provisions of Laws 1913, page 226, Section 2, when they were driven pursuant to licenses presumably issued in good faith.

From Clatsop: JAMES A. EAKIN, Judge.

In Banc.    Statement by MR. JUSTICE HARRIS.

C. G. Monroe and 10 other natural persons together with the Sanborn Cutting Company, a corporation, in May, 1915, commenced this suit for themselves and all others similarly situated, or who might desire to join in the suit, for the purpose of preventing R. S. Farrell from constructing pound net fish-traps on the north shore of Welch's Island in the Columbia River, a navigable stream. The defendants are James Withycombe, I. N. Fleischner, Marion Jack, C. F. Stone and F. M. Warren, who constitute the state board of fish and game commissioners, R. E. Clanton, who holds the position of master fish warden, and R. S. Farrell who holds three licenses, issued to him on April 1, 1915, by the master fish warden, purporting to authorize the holder to construct and maintain that number of pound net fish-traps at designated places on the north shore of Welch's Island.  The Sanborn Cutting Company is a corporation organized and existing under the laws of Oregon with its principal place of business in Astoria, Oregon, and is engaged in the business of catching, packing and preserving salmon.  Each of the remaining plaintiffs is a citizen and resident of Oregon and is engaged in catching salmon.  The corporation holds two licenses, issued on May 1, 1915, authorizing it to operate two seines in the waters of the Columbia River for the purpose of catching salmon; and each of the

remaining plaintiffs was licensed on May 1, 1915, to catch salmon in the waters of the Columbia River with a gill net.

Large quantities of salmon are found in the Columbia River and are of great commercial value. The salmon industry has grown to great proportions and for many years has been one of the principal industries of this commonwealth. Thousands of the citizens of Oregon earn their livelihood by catching salmon and annually the business aggregates hundreds of thousands of dollars. Salmon are generally taken by gill nets and seines. A gill net is made of twine so tied as to form meshes for the purpose of gilling the fish and is hung between two lines, one being known as the float because it floats on the surface, and the other as the lead because weighted down and kept beneath the surface of the water so as to suspend the net vertically. Seines are likewise made of twine, one edge of the seine being provided with floats and the other with sinkers so that it will hang vertically in the water, and when its ends are brought together or drawn ashore the seine encloses the fish caught within it. Gill nets and seines are floating fishing appliances; but a pound net fish-trap is a permanent and fixed structure. A pound net fish-trap as it is usually constructed in the Columbia River has three parts: The heart, pot and lead. The heart is constructed by selecting some point in the river, ranging from 200 to 800 feet from the shore line, according to the conditions found, and driving piling in the bed of the river so as to form the letter V with the point of the V upstream. The point of the V is not closed but it is left open and at this opening piling are driven so as to form a hollow square and this square makes the pot. Commencing at the lower end of the inner arm of the V, piling are driven

at convenient distances apart on a straight line to the shore. Webbing sufficiently wide to reach from the bed of the river to a point two or three feet above extreme high water is strung along and attached to the piling in the lead and heart of the trap. Webbing is also used in the pot but instead of being affixed to the piling it is so arranged that it can be lifted. Any salmon that migrate upstream and encounter the trap naturally attempt to pass the barrier and in making the attempt generally find their way into the heart and then into the pot of the trap where the fish are lifted from the water.

Welch's Island is within the boundaries of Oregon. Pursuing its westward course to the sea, the main channel of the river runs along the north side of Welch's Island. This channel extending along the north side of the island is not only a part of the main ship's channel, but, according to the complaint, it has also been the natural gill net and seining ground for the fishermen of the Columbia River and is "the most valuable drifting ground for gill nets and the most valuable ground for operating seines in the Columbia River." It further appears from the complaint that from time out of mind fishermen have taken salmon out of this channel and the waters along the north side of the island by means of gill nets and seines, and that during the fishing season fishermen habitually, daily and hourly navigate their gill nets and seines in these waters which, prior to the issuance of the licenses to Farrell, were universally recognized as a common ground of fishing for all fishermen operating gill nets and seines. Continuing, the complaint avers that "the citizens of the State of Oregon licensed to operate gill nets and seines are entitled of right, and are entitled under and by virtue of the laws and statutes of ·

the State of Oregon, to the free and unobstructed use of said channel and the waters thereof, for the purpose of navigating the same with both gill nets and seines, and have been exercising such right, accordingly as herein alleged for time immemorial.''

One license attempts to authorize Farrell to construct a pound, net fish-trap at a point on the north shore of the island about 800 feet from the mouth of Multnomah Slough; another trap is to be located about 4,200 feet below the first and the third is to be about 1,000 feet below the second trap.   Upon receiving the licenses Farrell commenced to construct traps at the three specified places; and, unless restrained, he proposes to complete the three traps so that they will extend out into the channel for a distance of 500 or 800 feet from the shore line.   The plaintiffs say that they have been using and intend to continue to use gill nets and seines in the waters of the river along the north side of the island, but if Farrell is permitted to build the traps plaintiffs will be prevented from using their seines and nets and it will have the effect of giving the exclusive use of that fishing ground to Farrell.

The plaintiffs further allege that the licenses held by Farrell were issued in violation of Chapter 128, Laws of 1913, and that although the plaintiffs petitioned to have the traps confiscated the master fish warden and board of game and fish commissioners nevertheless refused to do so.

All the defendants filed a joint demurrer; the members of the board of game and fish commissioners and the master fish warden joined in a second demurrer; and a third demurrer was filed by Farrell.   The trial court overruled the three demurrers and, when the defendants declined to plead further, a decree was entered declaring that ''the public have the prior right

of fishery and prior right to navigate the waters and channel of the Columbia River in front of Welch's Island'' for the purpose of operating gill nets and seines, enjoining Farrell from constructing fish-traps, and commanding the board of game and fish commissioners to cancel the licenses held by Farrell within twenty days from the date of the decree. All the defendants appealed.

Submitted on brief under the proviso of Supreme Court Rule 18: 56 Or. 622 (117 Pac. xi).    MODIFIED.

For appellants there was a brief over the names of *Mr. George M. Brown,* Attorney General, *Mr. Chriss A. Bell* and *Mr. Frank Spittle.*

For respondents there was a brief over the name of *Messrs. George C. & A. C. Fulton.*

MR. JUSTICE HARRIS delivered the opinion of the court.

For the purpose of this appeal the demurrers admit the facts alleged in the complaint, and consequently throughout the discussion it must be assumed that the complaint speaks the truth notwithstanding the fact that the plaintiffs make frequent use of the superlative degree. The Columbia River is a navigable stream. The waters along the north shore of the island are ''the most valuable drifting ground for gill nets and the most valuable ground for operating seines on the Columbia River''; and these waters have always been ''recognized as a common ground for fishing.'' Fish are classified as *ferae naturae,* and while in a state of freedom their ownership, so far as a right of property can be asserted, is in the state, not as a proprietor, but in its sovereign capacity for the

benefit of and in trust for its people in common: *State
v. Hume*, 52 Or. 1, 5 (95 Pac. 808) ; *Portland Fish Co.
v. Benson*, 56 Or. 147, 154 (108 Pac. 122) ; *State* v.
*Catholic*, 75 Or. 367, 374 (147 Pac. 372) ; *Harper* v.
*Galloway*, 58 Fla. 255 (51 South. 226, 19 Ann. Cas. 235,
26 L. R. A. (N. S.) 794) ; 11 R. C. L. 1041.   Upon its
admission to the Union, Oregon was vested with the
title to land under the navigable waters within the
state, subject to the public right of navigation and to
the common right of the citizens of this state to fish:
*Hume* v. *Rogue River Packing Co.*, 51 Or. 237, 246 (83
Pac. 391, 92 Pac. 1065, 96 Pac. 865, 131 Am. St. Rep.
732, 31 L. R. A. (N. S.) 396).   Quoting the language of
Mr. Justice MOORE in *Eagle Cliff Fishing Co.* v. *Mc-
Gowan*, 70 Or. 1, 12 (137 Pac. 766) :

"The right of fishing in a navigable stream in Ore-
gon is free and common to all the citizens of the state."

In the exercise of its police power and for the welfare of all its citizens the state can regulate or even
prohibit the catching of fish: *State* v. *Schuman*, 36 Or.
16 (58 Pac. 661, 78 Am. St. Rep. 754, 47 L. R. A. 153) ;
*State* v. *Hume*, 52 Or. 1, 6 (95 Pac. 808) ; *State* v.
*Catholic*, 75 Or. 367, 374 (147 Pac. 372) ; *Harper* v.
*Galloway*, 58 Fla. 255 (51 South. 226, 19 Ann. Cas.
235, 26 L. R. A. (N. S.) 794).

Farrell relies entirely upon the three licenses from
the state for his asserted right to construct the traps,
and consequently the legality of the disputed right
depends upon the legality of the authority attempted to
be conferred.   If Farrell is permitted to erect the
traps specified in the licenses the traps will have the
effect of excluding gill net and seine fishermen from
the waters in which it is admitted that previously all
the citizens of this state had a common right to fish.

In short, if it is lawful to authorize Farrell to erect these traps it is lawful to prohibit all other citizens of Oregon from exercising a right that is conceded to be common to all, and to grant to Farrell alone the exclusive right to fish in waters covering an area of more than a mile in length by 200 or more feet in width; and if it is lawful to grant to a single individual the exclusive right to fish in that area it is likewise lawful to grant an exclusive right to fish in a larger area. The licenses relied upon are issued by the master fish warden. His position is created and his authority is defined by the legislature, and therefore he cannot do what the legislature cannot empower him to do. If the legislature cannot grant an exclusive right to fish to one person, then the state could not through its master fish warden authorize the construction of the three controverted pound net fish-traps when they will have the effect of conferring an exclusive right upon a single person, because the state cannot lawfully do indirectly what it cannot do directly.

In most jurisdictions where the question has been presented for ultimate judicial decision it has been determined that the legislature has power to grant to a single person an exclusive right to catch floating fish: *Payne* v. *Providence Gas Co.,* 31 R. I. 295 (77 Atl. 145, Ann. Cas. 1912B, 65); *State* v. *Leavitt,* 105 Me. 76 (72 Atl. 875, 26 L. R. A. (N. S.) 799); *Phipps* v. *State,* 22 Md. 380 (85 Am. Dec. 654); *Commonwealth* v. *Hilton,* 174 Mass. 29 (54 N. E. 362, 45 L. R. A. 475); *Heckman* v. *Swett,* 107 Cal. 276 (40 Pac. 420); 2 Farnham on Waters and Water Rights, § 370. See also *Gough* v. *Bell,* 21 N. J. Law, 156, 165, and *Gough* v. *Bell,* 22 N. J. Law, 441, 459, criticising the prior case of *Arnold* v. *Mundy,* 6 N. J. Law, 1, 78 (10 Am. Dec. 356). In Washington it has been held that it is lawful to

grant to a single person exclusive control for a rea-
sonable distance and for a limited period: *Walker* v.
*Stone,* 17 Wash. 578 (50 Pac. 488) ; *Halleck* v. *Davis,*
22 Wash. 393 (60 Pac. 1116). In this jurisdiction,
however, the rule is firmly established that the legis-
lature cannot grant to one person an exclusive right to
catch salmon, because when that which belongs equally
to all the citizens of this state is taken from all and
vested in only one citizen it is equivalent to transform-
ing a public right, exercisable by all citizens alike, into
a private right and a monopoly, exercisable by only
one citizen, and it is therefore in violation of Article
I, Section 20 of the state constitution which commands
that "no law shall be passed granting to any citizen
or class of citizens, privileges or immunities which,
upon the same terms, shall not equally belong to all
citizens": *Hume* v. *Rogue River Packing Co.,* 51 Or.
237, 259 (83 Pac. 391, 92 Pac. 1065, 96 Pac. 865, 131
Am. St. Rep. 732, 31 L. R. A. (N. S.) 396) ; *Eagle
Cliff Fishing Co.* v. *McGowan,* 70 Or. 1, 15 (137 Pac.
766). See also *Slingerland* v. *International Con. Co.,*
43 App. Div. 215, 223 (60 N. Y. Supp. 12), affirmed in
169 N. Y. 60 (61 N. E. 995, 56 L. R. A. 494). Not even
the legislature could have granted to Farrell the ex-
clusive right to take salmon in waters where all the
qualified citizens of Oregon have the common right to
take floating fish; and therefore the licenses issued by
the master fish warden do not legalize the construc-
tion of the traps which Farrell proposes to build. The
question presented here is not whether all pound net
fish traps are *per se* unlawful; but the sole question for
decision is whether the traps which Farrell proposes
to build would be unlawful, and that question is de-
termined by the effect which it is conceded that the
traps would have upon the common right of all the

84 Or.—22

qualified citizens of this state. It is not necessary to decide whether the state can lawfully empower one person to the exclusion of others, to take shell-fish from a specified area of a navigable stream whose bed is owned by the state; nor is there any need to discuss the right to erect wharves and other similar structures in aid of navigation, since the proper exercise of that right is easily distinguishable from the instant case where an attempt is made to authorize only one person to fish for salmon for his own personal benefit and private profit without any advantage to the public.

The defendants contend, however, that the issuance of the licenses to Farrell forecloses any subsequent inquiry concerning the existence of prior fishing rights. Since this contention arises out of the language found in Chapter 128, Laws 1913, such portions of the statute as are now material are here set out:

"It shall be unlawful for the master fish warden or the board of fish commissioners to grant a license to any person, firm, partnership or corporation, to build or set up fish-traps or any other fixed fishing appliance, or drive piles therefor, in any locality in or on the Columbia River and its tributaries in this State, when in their judgment the same interferes with a prior right of fishing. Section 1.

"Whenever any fish-trap or any other fixed fishing appliance is built or set up in violation of this act, the master fish warden of the State of Oregon is hereby empowered, authorized and directed to confiscate and sell said fish-trap, and to remove all the piling driven for such purposes immediately, and he is authorized and directed to pay into the hatchery fund of that district of the State of Oregon the proceeds of said sale." Section 2.

The argument of the defendants is to the effect that Chapter 128, Laws 1913, prohibits the master fish warden and board of fish commissioners from issuing

a license for a pound net fish-trap if in their judgment the trap will interfere with a prior right of fishing; that the enactment confers upon the officers power to exercise their judgment and discretion and that in the absence of fraud an exercise of such judgment and discretion will not be interfered with by the courts; that the issuance of the licenses to Farrell presupposes that the master fish warden and the board exercised their judgment and discretion and determined that the issuance of the three licenses to Farrell and the construction of the licensed traps would not interfere with any prior fishing rights; and that therefore the courts will not and cannot prevent the construction of the traps because to do so would be to interfere with and supervise the judgment and discretion of the board and master fish warden. Before attempting to discuss the argument of the defendants it is proper first to make a brief survey of the legislation in force at the time of the passage of Chapter 128, because it may be assumed that this statute was adopted with reference to the laws then in effect. Section 5272, L. O. L., created a board of fish commissioners whose duty it was to appoint one master fish warden. The name and personnel of the board has since been changed, for it is now known as the State Board of Fish and Game Commissioners: Chapter 287, Laws 1915. The board was clothed with various powers: Sections 5273, 5282, 5313 and 5316, L. O. L. Section 5237, L. O. L., defined the closed season on the Columbia west of the Deschutes River. Section 5294, L. O. L., made it unlawful to operate and maintain a pound net "without first having obtained from the fish warden a license therefor as hereinafter provided." By the terms of Section 5298a, L. O. L., a qualified person desiring to

operate a pound net was required to "make application in writing to the fish warden" specifying the location of the pound net "and upon payment of a license fee as hereinafter provided, said fish warden shall issue to such applicant a license to operate the character of appliance desired in said application." All licenses expired on the 31st day of March following their issuance: Section 5303, L. O. L. After the owner constructed a pound net he was required to file a map with the fish warden "giving the exact description and location thereof." Section 5304, L. O. L.

It is not necessary to pursue the suggestion found in *Evanhoff* v. *State Industrial Acc. Com.,* 78 Or. 503, 516 (154 Pac. 106), and determine whether the present form of our state Constitution enables the legislature to clothe the master fish warden and board of fish commissioners with judicial power to inquire into and decide upon the existence of prior fishing rights, for the reason that it is obvious that the legislature has neither given nor attempted to give the warden and board authority to render a final adjudication of constitutional rights. There is a large class of cases where the legislature may vest in administrative officers power to determine when particular cases do or do not fall within a competent rule established by the legislature: 6 R. C. L., pp. 176, 179; and likewise the legislature may delegate to a board the power to stock a stream and close it against fishing, provided the order is not discriminatory: *Portland Fish Co.* v. *Benson,* 56 Or. 147 (108 Pac. 122); 11 R. C. L. 1042; and in such classes of cases the courts will not attempt to control or interfere with the judgment and discretion of the administrative officers. There is, however, an impassable chasm between the power to prohibit all persons from fishing in a stream and an attempt to

give one person an exclusive right to fish. The power of a board to close a stream exists only because the legislature, which delegates the power, itself has power to close the stream; but not even the legislature can lawfully favor one citizen with the exclusive right to fish in a navigable stream and consequently the legislature can neither directly nor indirectly empower a mere administrative board to do that which the legislature itself cannot do. All the citizens of Oregon have a common right to fish in the waters mentioned in the complaint and to deprive any one citizen of that right is to violate the state Constitution. To say that the mere issuance of the licenses closes any further inquiry into the existence of prior fishing rights because the courts cannot interfere with the judgment and discretion of administrative officers, is to say that these plaintiffs can be deprived of a right without a hearing, without an opportunity to be heard, and even without notice. Chapter 128, Laws 1913, makes no provisions for a notice or a hearing and it makes no attempt to vest the warden or board with judicial authority; and therefore the issuance of the licenses did not involve any of the elements of a final judicial adjudication of the fishing rights of these plaintiffs. If, on the other hand, the warden and members of the board are considered as mere administrative officers without judicial powers, the licenses issued by them to Farrell are invalid because they operate to confer an exclusive right upon Farrell. While the legislature has power to authorize administrative officers to issue licenses, yet the validity of such licenses, when issued, is to be determined by the results which follow an exercise of the authority named in the license rather than by the mere words found in the paper called the license. While Chapter 128, Laws 1913, does not at-

tempt to vest the warden or board with judicial power to adjudicate constitutional rights, nevertheless, if in its present form it is regarded as an attempt to do so, it would to the extent of such an attempt be unconstitutional; if, on the other hand, the warden and board be regarded as officers with only administrative powers, the validity of the licenses issued to Farrell is to be determined by the results wrought by them, and when so determined they are ascertained to be ineffective; and therefore in either event the plaintiffs are entitled to a decree preventing the construction of the traps.

Farrell drove three piling at each of the places designated by the three licenses, and plaintiffs allege that they petitioned the master fish warden and board to remove and confiscate them pursuant to Section 2 of Chapter 128, Laws 1913. The defendants argue that when the plaintiffs petitioned for the removal and confiscation of the piling on the authority of Chapter 128, they precluded themselves from afterwards questioning the validity of the statute. It is true that the plaintiffs do contend that Chapter 128 is unconstitutional to whatever extent it may be said to attempt to confer upon the warden and board authority to render a final adjudication of fishing rights or to grant exclusive rights to fish; but it is also true that the plaintiffs never at any time contended that Section 2 was invalid or that the whole chapter was unconstitutional for all purposes, although it may be invalid to whatever extent it may attempt to confer power to adjudicate existing rights or to grant exclusive rights.

While Farrell is not entitled to construct the traps or to maintain the piling driven at each of the three places, yet it would not be equitable to command the warden and board to remove and confiscate the nine piling under the provisions of Section 2 of Chapter

128, Laws 1913, when the piling were driven pursuant to licenses which were presumably issued in good faith; and therefore the mandatory injunction prayed for by the plaintiffs is denied.    The acts of the warden and board complained of by the plaintiffs were fully consummated before this suit was begun; it does not appear that the warden and board purpose to issue licenses in the future for traps along the island; and therefore the complaint and suit are dismissed without costs as to the warden and members of the board; but the licenses issued to Farrell are annulled and as to him the decree is affirmed.                          MODIFIED.