Motion to dismiss appeal denied December 2, 1930; submitted on briefs June 2; modified July 21; rehearing denied October 6, 1931

## DRISCOLL ET AL. *v.* BERG ET AL.

(293 P. 586, 1 P. (2d) 611)

*Edward C. Judd,* of Astoria, for appellants.

*Hesse & Franciscovich,* of Astoria, for respondents.

RAND, J.  Defendants move to dismiss the appeal in the above cause upon two grounds: 1, that the notice of appeal filed by plaintiffs fails to sufficiently identify the decree appealed from, and, 2, that the decree appealed from was a consent decree and hence not appealable.

The record shows that on August 6, 1930, a decree in favor of plaintiffs and against defendants was made and entered in the circuit court for Clatsop county and that thereafter, on September 3, 1930, on motion of defendants, a decree reciting that the original decree "be and the same is hereby amended and modified nunc pro tunc as of August 6, 1930." The decree also recites that "counsel for plaintiffs consenting to the modification of said decree." The notice of appeal states that: "plaintiffs * * * appeal to the supreme court * * * from the decree of the circuit court * * * made and entered in the above-entitled court and cause on the 6th day of August, 1930."

■ It is contended that because the modified decree was rendered on September 3, 1930, as of the date of August 6, 1930, and became a substitute for the original decree, plaintiffs should have referred to it in the notice of appeal as of the date on which it was rendered and, not having done so, the notice of appeal is insufficient, although the amended 'decree was entered in the records of the court as of August 6, 1930, the day when the original decree was entered.  We think, in view of the holding of this court in *Lee v. Gram,* 105 Or. 49 (196 P. 373, 209 P. 474, 27 A. L. R. 1001), that, under the circumstances disclosed by this record, the descrip-

tion of the decree appealed from was sufficient. The defendants could not have been misled by the description contained in the notice, nor have their rights been prejudiced.

Nor do we find any merit in the contention that plaintiffs consented to the entry of the decree. Plaintiffs consented that the decree should be modified in certain particulars but the consent given was to a slight modification of the original decree and not to the entry of any decree against plaintiffs in the suit.

The motion to dismiss the appeal must, therefore, be overruled.

Coshow, C. J., dissents.

---

### On the Merits
(1 P. (2d) 611)

*Edward C. Judd*, of Astoria, for appellants.

*Hesse & Franciscovich*, of Astoria, for respondents.

KELLY, J. The question herein involved is whether the further licensing and operation of the lower fish trap, being the trap that for the year 1930 bore license

number 545, should be enjoined. This trap was driven in the fall of 1929. It was operated for a time. Later the ice in the river came down and broke the pilings off and took it out leaving only old broken piling there. In the spring or early summer of 1930, it was redriven.

Defendants contend that it has not been proven that the trap in question would obstruct, interfere with, or prevent the common right of fishing with nets. It is also urged that plaintiffs have not come into court with clean hands.

Defendants also claim that:

"By failing to object to the granting of the original license for the lower trap location, and by permitting the construction and operation thereof during the year 1929, and by failure to object to the issuance of a renewal license, and by permitting the construction and operation of this particular trap for the year 1930, plaintiffs, if they ever had any prior right of fishing, have lost the same, and on account of their conduct ought to be and are now estopped from asserting a prior right of fishing or navigation over defendants' renewal license for lower trap 545."

The question whether the fish trap in suit interferes with, obstructs and prevents gillnet fishing is one of fact, which presents two phases: First, we must determine whether or not at the locality of such trap and its vicinity, there are fishing grounds in which gillnet fishermen ply their vocation; and, second, if so, whether the trap in question prevents and obstructs such fishing. In referring to the first phase of the question, ten of the plaintiffs have testified that at each season they have fished these waters with gillnets and have caught many hundreds of pounds of blue-back salmon. Opposed to this, there is testimony by the deputy fish warden that he had passed the site in controversy once or twice a week during the time involved

in this suit and had not observed any one fishing with gillnets in the immediate vicinity of the north bank of Grassy Island. There is testimony by this witness that in June or July, 1929, in company with two members of the fish commission he saw the site of the trap in question, and that there he had found shallow water; that the boat in which he was riding and which drew two and one-half feet of water ran aground at that place, and on this occasion this witness saw but one boat operated by those fishing in that vicinity and this boat did not come nearer than 500 feet from the proposed site of the trap.

A view of these waters was had by the court on the first day of the trial. There is testimony that at the time of such view, in making the test drift, snags were encountered and some of defendants' witnesses, with experience as gillnet fishermen, testify that this indicates that the waters, where these snags were found, had not recently been fished with gillnets.

In their answer, defendants allege:

"That at and during all of the several times hereinafter mentioned, there was and now is located at about the center of the Columbia river in Clatsop county, Oregon, one certain island known as Grassy Island, and that many years ago the waters of the Columbia river immediately north of Grassy Island, being the same location where the fish traps complained of in plaintiffs' complaint on file herein are located, was and constituted a deep, navigable channel, but that on account of erosion and alluvion constantly going on, and by reason of the flow and ebb of the tide, and on account of freshets, the channel immediately north of said Grassy Island for many years past by a constant and imperceptible progress has continued to shoal up until at the present time the said bed of said Columbia river immediately north of said Grassy Island where said two fish traps complained of in plaintiffs' complaint are now located is now of an insufficient depth,

and the condition of the bed of said river at that particular place is such, so as to prevent said particular location to be fished with gillnets of such construction, length and depth as are usually and customarily employed by gillnet fishermen on and along the Columbia river."

The testimony as to the alleged shoaling up of the bed of the river is fragmentary and unconvincing.

The second phase of this question involves a consideration of whether the trap in question would obstruct, interfere with, or prevent gillnet fishing. Upon this phase of the question eight of the plaintiffs have testified as the learned trial judge stated in his ruling upon a motion for nonsuit, "in one way or another that the proposed trap would interfere with their drifts." Several of the plaintiffs testified that at different times their nets have been caught upon the piling of the trap in question and damaged. Others of them testify that the operation of the trap prevented them from using that drift as fishing ground for gillnet fishing. As stated, on the first day of the trial a view of the waters involved herein was had by the court and test drifts were made. The test, with respect to the lower trap, was accomplished by anchoring a boat as nearly as possible at the site of that trap. A gillnet then was laid out below on flood tide, and when the net drifted past the boat, the net was quite a distance away from the boat. The witnesses who estimate this distance said it was about 300 feet.

As the writer views it, at most this test comprised a single instance when upon a particular stage of flood tide the trap would not have interfered with the net. It avails but little, if anything, in considering the probable result of tests at other stages of the tide. As to the lower trap, the record is silent upon the result of the test later attempted upon the ebb tide.

One of the plaintiffs testified as to the course taken by nets as follows:

"They drift with the tide up stream or down. If the tide was flooding they would go up and on ebb they would drift down and you drift in this way in different directions. Sometimes you would go in one direction and at other times in other directions. You don't always go exactly the same—in the direction which you are drifting."

As the writer reads the record, the plaintiffs' testimony preponderates upon both phases of the question under discussion.

■■ The citizens of Oregon have a common right to fish in the waters mentioned in the complaint, and to deprive any one citizen of that right is to violate the state constitution. The operation of a fish trap, therefore, which deprives fishermen from fishing with gillnets in navigable waters otherwise adapted thereto is in violation of section 20, article 1 of the state constitution which commands that:

"No law shall be passed granting to any citizen or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." *Monroe v. Withycombe,* 84 Or. 328 (165 P. 227).

■ To support their contention, that plaintiffs do not come into court with clean hands, defendants have introduced testimony tending to show that fishermen belonging to drift unions prevent those who do not belong to such unions from fishing in the drifts involved. These so-called drift unions are comprised of a number of fishermen organized to enable them to clear the fishing grounds of snags, and it is claimed that unless the dues prescribed are paid by those who desire to fish in a given drift, the members of such drift union will cork nonpaying fishermen; that is, lay

out nets in front of them and thereby prevent such nonpaying members from catching any fish. It appears in the record that some of the plaintiffs are not members of such unions. These plaintiffs, who are nonmembers, testify that they have not been prevented from fishing; and the plaintiffs, who are members, testify that they do not cork nonmembers. There is no party to this litigation who is concerned with the alleged custom thus described. We think that, as applied to this record, plaintiffs have not been shown to be in court with unclean hands within the meaning of the well-known maxim that equity will not relieve one who does not come into court with clean hands.

The cases cited by defendants on this point disclose that the dereliction in each of those cases directly affected some party thereto. We are well aware that there are authorities that withhold equitable relief, because of iniquity not directly affecting any party to the case under consideration; but, in this case, the inequitable conduct alleged has not been proven.

■ Defendants argue that by failing to object to the granting of the original license for the lower trap location, by permitting its construction and operation in 1929, by failure to object to the issuance of a renewal license, and by permitting its construction and operation in 1930, plaintiffs ought not to be permitted to assert a prior right of fishing or navigation over defendants' renewal license for lower trap number 545.

There is no direct testimony to the effect that the lower trap was operated in 1930. Inquiry by counsel, for defendants, of the master fish warden, as to whether Berg had paid a poundage fee for the 1930 catch, was met by the statement that the poundage tax is paid by the buyers and not the licensee. At most,

then, defendants' position, in this regard, is that, because plaintiffs did not object to the issuance of the original licenses in 1929, did not seek to enjoin the construction of the trap in the fall of that year, and took no action with respect to the renewal license issued in 1930, or in the reconstruction of the trap in the spring or summer of 1930, until June 17, 1930, when this suit was filed, defendants are not entitled to the relief they seek. Neither the elements essential to estoppel nor facts constituting laches on plaintiffs' part are shown.

■ Defendants, however, call attention to section 127, and a portion of section 137, of chapter 105, p. 156, et seq., of the 1921 Session Laws (§§ 40-507 and 40-518, Oregon Code 1930). Said section 127 provides:

"The failure to renew the license, or make application therefor, for any fish traps, poundnet, fish wheel or location for other fixed appliance, in any of the waters of this state, on the first day of April in any year, shall constitute abandonment of the location."

The cited portion of said section 137 provides:

"(e) Failure on the part of any person, firm or corporation to pay the poundage fee herein required shall be reason for the forfeiture of the license or licenses granted to said person, firm or corporation for the operation of any of the appliances licensed by the master fish warden, for the purpose of taking salmon, shad or sturgeon, and anyone so failing to pay the poundage fee so required shall be denied a renewal of said license, or the issuance of any license for the operation of any of the appliances herein mentioned, which are licensed by the master fish warden."

From these statutory excerpts, defendants argue that it was the intention of the legislature to grant unto a person, who secures a license for the operation

of a fish trap, not only the right to operate such trap during the particular year in which the original application is made, but the further right to continuously keep on renewing this license from year to year provided his application for a renewal is filed before April 1st of the following year, and further provided the operator thereof has complied with all of the laws with reference to the filing of reports and the payment of poundage tax, and provided further that the location has not been abandoned. In other words, by virtue of these statutory provisions and the renewal of the licenses first issued, Berg's right to operate a trap has ripened into a renewal right of fishing with such trap, at his pleasure, for such a length of time as he sees fit. In effect, defendants say that because of the statutory provisions, above quoted, and Berg's compliance therewith, Berg had a prior right of fishing, which was paramount to the right common to all citizens, including plaintiffs, and hence, no injunction should be granted restraining him from the exercise thereof. The vice of defendants' argument in this regard lies in the fact that the right which plaintiffs assert is a constitutional right, and, if tenable and enforceable at all, cannot be destroyed by any legislative enactment.

The decree of the circuit court is hereby modified to read that the defendant Otto Berg, and all other persons, acting by, through or under him, are enjoined and restrained by an injunction, as long as present conditions, as to currents, depth of water and river bed, continue to exist from constructing a poundnet fish trap under Oregon State License No. 545, and also likewise so enjoined and restrained by an injunction from constructing a poundnet fish trap under Oregon State License No. 546, and from driving any piling in

navigable waters of the channel of the Columbia river north of Grassy Island in the location, or either of them known as lower trap location, being trap site number 545, and the location known as the upper trap location, being trap site location number 546, and from operating or constructing in said waters or either or both of said particular locations any poundnet fish trap or traps or other stationary fishing device for taking or catching salmon fish.