Motion to dismiss appeal denied May 12, 1931; argued February 25; affirmed April 19, 1932

RADICH ET AL. *v.* FREDRICKSON ET AL.

(10 P. (2d) 352)

*Frank C. Hesse,* of Astoria (Hesse & Franciscovich, of Astoria, on the brief), for appellants.

*A. C. Fulton,* of Astoria (G. C. & A. C. Fulton and Edward C. Judd, all of Astoria, on the brief), for respondents.

ROSSMAN, J. Before stating the issues awaiting decision it seems desirable to describe the location in dispute. As the waters of the Columbia river reach Tenas Illihee island they divide themselves into two parts and thus form two channels. The waters which flow to the right as they pass on their way to sea constitute the main channel of the Columbia river. With that channel we are not concerned. Those which flow to the left take their course in what is known as the Clifton channel. It is this channel with which we are, in part, concerned. About a mile below Clifton in the Clifton channel is the commencement point or towhead of what is known as Cottonwood drift. A drift is an expanse of water over which gill net fishermen drift their nets. (For a description of a gill net see *Monroe v. Withycombe,* 84 Or. 328, 331 (165 P. 227). Salmon swim against the current and gill themselves in the meshes of the gill nets which drift downstream with the ebbing tide. The nets used by the plaintiffs are approximately 1,200 feet long and are placed in the water at right angles to the shore line at the towhead. The plaintiffs' witnesses testified that Cottonwood drift extended from the towhead downstream two and one-half miles. Since the defendant Fredrickson contends that the drift extended only one mile below the towhead, and that it was impossible to drift a 1,200-foot net below that point, we shall now describe the waterways below the towhead.

To the left of Clifton channel at the towhead is the mainland. To the right is Tenas Illihee island. When

the nets have drifted approximately one mile below the towhead a point is reached where Clifton channel divides itself into two courses. Quinn's island is the body of land which splits the channel. The fork which extends to the right is a continuation of Cottonwood drift, according to the plaintiffs' witnesses. With the left fork we are not concerned. It may help one to obtain a mental picture of the surroundings to suggest that the two forks and the main channel out of which they have emerged assume the form of the letter Y, with Quinn's island filling the area between the two forks. Beyond the right fork, which is approximately 6,000 feet in length, is a wide, deep expanse of water which eventually leads into the main channel of the Columbia river. The waters in the stem of the Y over which the nets drift are amply wide and deep to accommodate them, but when the nets reach the above mentioned division point a different condition is encountered. The right fork which pursues a course almost due north is bounded on the east by a continuation of Tenas Illihee island, on the left by Quinn's island, and is approximately 1,400 feet wide. Only the water in the easterly 550 feet of this fork is sufficiently deep at low tide to accommodate gill nets. All of the remainder of this channel is no deeper than five feet at low tide. Beyond this right fork is the expanse of water above mentioned which is of ample depth to suit the needs of gill net fishermen, and in it, according to the plaintiffs' witnesses, the nets drift for a distance of 1,000 feet more when the end of Cottonwood drift is reached. A few feet beyond this point is the towhead of Castura drift. The defendant Fredrickson constructed the fish trap (for a description of such a device see *Monroe v. Withycombe,* 84 Or. 328, 331 (165 P. 227)) in the portion of the channel where the

deep water is only 550 feet wide. It extended from the shore of Tenas Illihee island out into the channel for a distance of 300 feet. The water in its vicinity is about 30 feet deep at low tide.

■ The defendant Fredrickson contends: (1) that Cottonwood drift extends no farther than the point where Clifton channel is divided into two forks by Quinn's island; (2) that since the nets used by the plaintiffs are at least 1,200 feet long, it is impossible to employ them advantageously in the right fork which contains deep water for a width of only 550 feet; (3) that since the plaintiffs, in order to use Cottonwood drift with safety for their nets, remove from it snags and other debris, this circumstance proves that it is unsuited to the needs of gill net fishermen if left in its natural condition; (4) that since: (a) the gill net fishermen who employ Cottonwood drift apportion among themselves the cost of keeping the channel clear of snags, (b) have adopted a practice of starting from the towhead in numerical order determined by allotment, and (c) prevent those who do not submit to the foregoing from using Cottonwood drift (according to the defendants' contention), they are guilty of inequitable conduct which denies them recourse to a chancellor; and (5) that the plaintiffs as gill net fishermen are entitled to no rights superior to those of the defendant which will warrant the relief which the plaintiffs seek.

The decision of the first of the above issues requires a study of the evidence. We have examined all of it with care. The plaintiffs presented ten commercial fishermen, each of whom testified that he possessed a practical knowledge of and had had several years' experience with gill net fishing. One of these swore that for 44 years he had drifted gill nets along Cottonwood drift. Another testified that he had done

so for 21 years. Each of them, as well as several of the others, used nets 1,200 feet long and 12 feet deep. All of the plaintiffs' witnesses described the course of Cottonwood drift as starting at the towhead about one mile below Clifton, proceeding down Clifton channel and through the right fork of that channel as it takes its course between Quinn's and Tenas Illihee islands to the Castura towhead. The defendants offered the testimony of seven witnesses, each of whom had observed gill net fishermen drifting their nets along Cottonwood drift, and each of whom testified that the fishermen removed their nets from the water as they approached the point where the channel is divided into two forks by Quinn's island. A circumstance which we believe strongly corroborates the plaintiffs' witnesses is the fact that those who use Cottonwood drift have adopted the aforementioned practice of removing from the bed of the channel snags and other objects which would interfere with their nets. Manifestly, the plaintiffs would not remove that material from the right fork unless they drifted their nets through there. All of the plaintiffs' witnesses testified that they regarded the drift as a valuable one. One of them thus described its desirability: ''One of the best on the river.'' Another thus: ''It is considered one of the best drifts.'' And another: ''It is one of the best drifts we got.'' The findings of the circuit judge who heard the witnesses and who participated in two test drifts along the challenged part of the course, found that Cottonwood drift extended through and beyond this right fork of Clifton channel. Having bestowed upon the testimony careful attention, we are of the same opinion.

The defendant Fredrickson, after contending that it would be impossible for the plaintiffs' nets, 1,200

feet long, to catch any fish while drifting through that portion of the right fork where the water is deep for a width of only 550 feet, submits that her trap, therefore, has deprived the plaintiffs of nothing of value. Her argument is based upon the contention that a net 1,200 feet in length, when drifting through a channel only 550 feet wide, is forced into a position where it can not catch fish. She contends that when a net is not at right angles to the current it produces no results. Her witnesses testified that when a gill net is no longer than the available width of the channel a portion of the lead line is bound to scrape along the bottom of the channel, and that when this occurs the meshes are forced out of the form which is suitable for the catching of fish. The plaintiffs' witnesses testified that it is practicable to operate 1,400-foot nets through this narrow channel. Several of them swore that when both extremities of the lead line scrape bottom the action of the current upon the middle section of the cork line causes the net to assume a horseshoe shape as it drifts down the north fork. They testified that while the net is in this form, or is proceeding down the channel parallel to the course of the current, or is in a zigzag form, the fish readily become gilled in its meshes. The circuit judge who tried this case participated in two test drifts and concluded that this north fork was a suitable area for the use of gill nets. A circumstance which is persuasive to us is the fact that those who employed Cottonwood drift valued this north fork area so highly that every April when the fishing season is closed they clear from it snags and other debris which, if not removed from the bed of the channel, would interfere with the safe operation of their nets. We conclude that it is practicable to operate gill nets in this portion of Cottonwood drift.

: The defendant Fredrickson, after calling our attention to the fact that the plaintiffs annually perform the work just mentioned, argues that they thereby interfered with the natural condition of the channel, and contends that if those acts had not been performed the channel could not have been employed by gill net fishermen. The evidence indicates that the spring freshet carries into Cottonwood drift snags, timbers and other objects which in some instances become lodged in parts of the channel bed, and that during the month of April when fishing is not permitted by law the fishermen remove those objects from the channel so that they will not interfere with the drifting of the nets. The evidence also indicates that gill net fishermen in other parts of the Columbia employ the same practice. The extensive lumbering operations conducted along the Columbia river and its tributaries cause logs, lumber and sawmill refuse to be set free into the current which visits the fishing grounds along the lower Columbia on its way to the sea. Only an indifferent fisherman would fail to rid his drift of this waste and fugitive material. The plaintiffs have not altered the course of the channel which apparently has existed in its present condition through the centuries. They have done nothing to induce the fish to come to their drift. The effect of their operations is limited to making the course safe for the drifting of their nets. The portion of Clifton channel which constitutes Cottonwood drift is a navigable waterway open for the public's use, to which all may resort for travel and the catching of fish. What the plaintiffs have done is beneficial, and the public has offered no objection. Since Clifton channel is not clogged with refuse, we may safely assume that the freshets and high tides have in the past swept on to the sea the materials deposited there at other times,

and that the clearing operations conducted by the plaintiffs have simply assisted or hastened the work of the elements. We are unaware of any reason which demands a holding that the waters known as Cottonwood drift are not available for the operations of the plaintiffs.

The defendants next call our attention to the fact that the fishermen who use Cottonwood drift apportion among themselves the expenses and labor of clearing it of snags, and that they have also established a method for determining the order in which they cast off from the towhead. The defendants contend that the evidence further shows that the plaintiffs will not permit anyone to use Cottonwood drift who refuses to bear a part of this expense and submit to the established order of starting off from the towhead. They argue that the effect of these practices is to create a monopoly for the plaintiffs and that when the latter seek the relief prayed for in their complaint, they are, in fact, asking the assistance of the courts in the establishment of that monopoly. The same contention was urged in *Driscoll v. Berg*, 137 Or. 499 (293 P. 586, 1 P. (2d) 611). It was there held that the evidence failed to show that those who performed the work and submitted to the method of rotation had denied to anyone the privilege of drifting upon the course. We have carefully studied the evidence in this case and believe that it demands the same conclusion. The mere fact that those who secure safety for their nets by helping to clear the drift from debris voluntarily contribute their proportionate share is not inequitable conduct. Nor is it inequitable for them to effect an arrangement whereby they cast off from the towhead at safe distances from one another so as to avoid corking of nets.

■ The remaining contention submits the question whether the maintenance of the fish trap as it projects into the deep water of the channel violates any rights possessed by the plaintiffs which entitle them to the relief awarded by the decree of the circuit court. In addition to the evidence already reviewed, we note that one Dan Welch, who owns a portion of Quinn's island, testified that the trap interfered with the operation of the seining nets conducted from his property. We believe it is evident from the record before us that the effect of the fish trap is to exclude all others from pursuing the common right of fishing in the waters adjacent to the fish trap, and to secure for the defendant Fredrickson the exclusive right to take fish from the surrounding waters. Several decisions of this court indicate clearly that one can not obtain a monopoly of fishing in the navigable waters of this state in such a manner. See, for instance: *Hume v. Rogue River Packing Company,* 51 Or. 237 (83 P. 391, 92 P. 1065, 96 P. 865, 31 L. R. A. (N. S.) 396, 131 Am. St. Rep. 732); *Johnson v. Jeldness,* 85 Or. 657 (167 P. 798, L. R. A. 1918A, 1074); *Eagle Cliff Fishing Company v. McGowan,* 70 Or. 1 (137 P. 766), and *Driscoll v. Berg,* supra. In the latter case the facts were very similar to those now before us. In fact, the locations of the drift course and of the intruding fish trap were in the same general locality as that with which we are now concerned. Mr. Justice KELLY, on behalf of this court, in disposing of a contention similar to that now awaiting our disposition, there said:

"The citizens of Oregon have a common right to fish in the waters mentioned in the complaint, and to deprive any one citizen of that right is to violate the state constitution. The operation of a fish trap, therefore, which deprives fishermen from fishing with gill

nets in navigable waters, otherwise adapted thereto, is in violation of section 20, article 1 of the state constitution, which commands that: 'No law shall be passed granting to any citizen or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens.' ''

It follows from the foregoing that the decree of the circuit court will be affirmed. Costs will be allowed to none of the parties.

BEAN, C. J., RAND and KELLY, JJ., concur.