Argued May 15; reversed July 2; rehearing denied
September 3, 1935

JOHNSON ET AL. v. HOY ET AL.

(47 P. (2d) 252)

*Wm. P. Lord*, of Portland, and *F. M. Franciscovich*, of Astoria (T. Walter Gillard, of Portland, and Hesse & Franciscovich, of Astoria, on the brief), for appellants.

*A. W. Norblad*, of Astoria (Norblad & Norblad, of Astoria, on the brief), for respondents.

BELT, J.   Plaintiffs, gill net fishermen, by this suit commenced on June 1, 1934, seek to compel the removal of a fish trap located on the west end of Sand island in the lower Columbia river.  The license to construct and maintain the trap was issued by the defendant Master Fish Warden to the defendant Graham Fish Corporation on April 3, 1934.  From a decree dismissing the suit, the plaintiffs appeal.

■■ It is well-settled law in this jurisdiction that the legislature can not grant to one person or corporation an exclusive right to catch salmon in the navigable waters of this state.  The right of fishery is common to all the citizens of the state.  To deprive citizens of such right would be in violation of the state constitution which commands that "no law shall be passed granting to any citizen or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens": *Monroe v. Withycombe,* 84 Or. 328 (165 P. 227), and authorities cited therein.  Also to the same effect see the much later cases of *Driscoll v. Berg,* 137 Or. 499 (293 P. 586, 1 P. (2d) 611) ; *Radich v. Fredrickson,* 139 Or. 378 (10 P. (2d) 352) ; *Strandholm v. Barbey,* 145 Or. 427 (26 P. (2d) 46). It is equally well settled in the light of the above cases that, where a trap or other stationary gear is so placed in navigable waters as to interfere with the exercise of the common right of fishery, it is unlawful and any license issued purporting to authorize the construction or maintenance of such fixed gear is a nullity. It is significant that the state of Washington by legislative enactment last year prohibited the use of fish traps and other stationary fishing gear in its navigable waters.

It is alleged in the complaint that the plaintiffs and many other fishermen similarly situated have for many years fished with gill nets the waters of the Columbia

river between Sand island and Cape Disappointment, the waters of Baker's bay and, in particular, the waters covered by the trap in question, and that, by reason thereof, a prior and common right of fishery exists. It is further alleged in substance that the trap in question is so constructed and maintained in the navigable waters of the Columbia river that the plaintiffs have been deprived of such common right of fishery, and that their lives and property have been jeopardized.

In view of the above legal principles it seems clear that the plaintiffs would be entitled to the relief demanded if such allegations of the complaint were established by a preponderance of the evidence. Before considering the evidence to determine whether there has been a wrongful interference with plaintiffs' right to engage in catching salmon by means of gill nets, it is, perhaps, well to make a brief and general statement of the facts relative to the locus in quo.

Reference to the following rough plat may be helpful.

Sand island is located near the mouth of the Columbia river. It is a low, narrow, sandy body of land about three miles long, extending in an easterly and westerly direction. Between this island and Cape Disappointment is the north ship channel of the Columbia river, the thread of which constitutes the boundary line between Oregon and Washington. This channel is referred to in the record as the Ilwaco channel. It leads in a northerly direction from the main channel of the Columbia river and widens into what is known as Baker bay. On each side of the mouth of Ilwaco channel are sand spits which at low tide are not covered by water. The channel entrance at mean low tide has a depth varying from 3.6 feet to 13.1 feet and is approximately 100 feet wide. The channel, however, is about 700 or 800 feet in width where the trap is located. The trap extends into this channel approximately 300 feet and is about 3,000 feet north of the mouth of the channel. At mean low tide the water reaches a depth of 13 feet in the heart of the trap which is located in the deepest part of the channel.

Many years ago Baker bay was much deeper than it now is and was generally considered good fishing ground. Commencing in the years 1918 and 1919, Baker bay began to fill up with sand and in recent years the water has become so shallow that it is utterly impracticable to fish such ground with an ordinary-sized gill net. As a result of winter storms, great changes occur in the channel of the river. During the last two or three years, the Ilwaco channel has been moving rapidly towards Sand island. Three years ago the present situs of the fish trap about which complaint is made was dry sand.

The evidence is clear and convincing that the waters in and around the trap in controversy are not suitable

or adaptable for ordinary gill net fishing. The nets which the plaintiffs and other fishermen ordinarily use are from 1,200 feet to 1,500 feet in length and are from 24 to 30 feet in depth, but at times they fish with a much shorter and less numbered mesh net—depending upon existing conditions. There is no substantial evidence that any regular gill net fishing has been done in Ilwaco channel during recent years although there is ample evidence of light fishing gear having been used therein. The principal fishing is done along the south shore of Sand island in the main channel of the river. On ebb tide the nets are put out at a place about 2,000 feet east of the mouth of Ilwaco channel and a drift is made towards the bar. When the tide turns, the drift is made back on the flood. At certain stages of the tide—especially when the weather is rough and a southwest wind is blowing—the nets are occasionally drawn into Ilwaco channel against the fishermen's will. In such rough and dangerous water it is often impossible to "pick up" the net and the fisherman is obliged, in order to save his life and property, to cut loose the net from his boat and let it drift over the spit and up into the channel where he hopes later to recover it. The net can ordinarily be "picked" in calm weather before being drawn into the Ilwaco channel. In many instances, nets and boats have been drawn in over the spit into the channel and, as stated by the trial judge in his memorandum opinion, "on several occasions in the past, nets have been thrown up against traps northerly of the trap in question".

We think it is also established by the preponderance of the evidence that the trap in question—which is nearer the mouth of the channel than the other traps mentioned—constitutes a danger and menace to life

and property when nets are drawn into the channel during times of storm. It will be recalled that most of the fishing is at night. The current is about five or six miles per hour and turns in towards the trap about which complaint is made. A boat against the piling under a strong south wind would, indeed, be in danger of being capsized. A net entangled with the piling of the trap and with a swift current carrying sand through its meshes undoubtedly means a substantial property loss.

The fact situation in the instant case differs from that involved in *Monroe v. Withycombe*, supra, *Driscoll v. Berg*, supra, *Radich v. Fredrickson*, supra, and *Strandholm v. Barbey*, supra, in that, in the cases cited, the fish trap was located in the actual line of drift and in waters adapted to gill net fishing, whereas here the trap is not located in waters adapted to gill net fishing. The real grievance of the plaintiffs is that, after they are drawn into the mouth of the channel in times of storm, they do not have sufficient time to pick up their nets on account of the danger of being carried onto the trap by the strong current and wind.

As before stated, the evidence shows that the waters of Ilwaco channel are not now adapted to the kind of fishing in which plaintiffs are engaged, although many years ago it was good gill net fishing ground. We think the decision of the case hinges, however, on the question of fact as to whether the trap unreasonably interferes with the picking up of the nets after the drifts have been made in waters adapted to such fishing. It is the contention of counsel for respondents—and such theory was adopted by the trial court—that the trap, in order to be an interference with gill net fishing, would have to be actually located in waters adapted to such fishing. We

think this view places too narrow a construction upon the term "fishing". Such term is thus defined in 26 C. J. 594: "To be employed in taking fish as by angling or drawing a net; a pursuit consisting, not of a single but of many acts, according to the nature of the fishing. It is not the isolated act alone either of surrounding the fish by the net, or of taking them out of the water and obtaining manual custody of them; it is a continuous process beginning from the time when the preliminary preparations are being made for the taking of the fish and extending down to the moment when they are finally reduced to actual and certain possession". We agree with appellants that picking up the net is a part of the fishing operation. The last act is getting the fish into the boat. If the trap is so located as to unreasonably interfere with picking up the net, a limitation or restriction of the common right of fishery unquestionably results.

We turn to the evidence to ascertain whether the trap constitutes an unreasonable interference. In the consideration of the evidence it is important to bear in mind that the trap was constructed in June, 1934, and that the trial occurred in the early part of the following month. Furthermore, it was in the early part of the fishing season. Hence, evidence of fishermen's boats and nets having been endangered by this trap is necessarily limited.

The plaintiff Arne Johnson, who has had 18 or 20 years' experience as a gill net fisherman in the lower Columbia river, testified that the trap interfered with fishing as follows:

"A. Well it is in rough weather; the net goes in over this sand, and we cannot pick it up on that spot there because it is rough and then we have this little space between these breakers to the trap and if you

have a little trouble and know you cannot take it in 20 minutes to take a net in but then we have to give it all back; we have to get it in; if the net is bunched you can't get it in; it is about then it goes on the trap and you get one more net.

"Q. If you drift into the trap what happens to your net?

"A. It is there and the current is so strong you can not pull it out of there and it will sand against the trap the whole tide; there is nothing left of it, it is all worn up because it is just twine, the gill net."

He also said that, in the latter part of the season of 1933, he went into the Ilwaco channel "most every night" but that he always sought to avoid doing so. He did not know of any nets going on the trap although he had trouble with his boat when it was carried against the piling but was successful in getting his net out before it became entangled. He further testified that in ordinary weather he was able to pick up his net before getting into the channel.

Theodore Johnson, a witness on behalf of the plaintiff, who has had over 20 years' experience as a gill net fisherman in the same territory, testified in substance that his boat had been drawn into the channel on an average of about a dozen times each season; that his net had never been caught in the trap in question, but that the trap, in his opinion, was a constant danger as "You can't get your net in boat fast enough". He further testified that if the trap were not there the nets would drift beyond that point. He also stated that his net did strike the trap about 900 feet north of the one in controversy.

Lars Bjelland, officer in charge of the United States Coast Guard at the Point Adams station whose duties required them daily to patrol the lower end of Sand

island, testified on behalf of the plaintiffs that fishermen being drawn into this channel was "really a daily occurrence"; that he had never "picked up any one on the trap" and that, in his opinion, the trap interfered with fishing operations.

Emil Ekholm, a witness for the plaintiffs, who has had eight years' experience as a gill net fisherman, testified that the trap interfered with gill net fishing as there was not sufficient time to pick up the net after coming into the channel. He also stated that the situs of the trap had always been a "picking up place for nets".

Wm. Lampa, one of the plaintiffs, who has had over 25 years' experience as a fisherman in the lower Columbia river, and who fished mostly off Peacock spit, testified that he had gone into the Ilwaco channel many times as a result of the suction of the flood tide and that on the night of the 18th of June, 1934, seven fishing boats, including his own, were drawn into this channel. He further testified that he had had serious difficulty in saving his net from the trap. In answer to the question, "How long did it take you to get it in?", he answered, "Well I couldn't say then how fast a man could work when he works for his dear life". Lampa was emphatic in testifying that the trap constituted a real danger to fishing.

Wayne Aho, witness for the plaintiffs, who has had several years' experience in fishing in this territory, testified in substance that the channel below the trap was customarily used to pick up nets and that the trap was a source of danger. He also stated that he saw Theodore Johnson's net carried by the current into the immediate vicinity of the trap but that they succeeded in towing it around the end thereof.

Oscar J. Wirkkala, witness for the plaintiffs, a gill net fisherman of many years' experience, testified as to the interference of the trap with fishing operations. Witness the following portion of the record on cross-examination:

"Q. The objection to this trap as I understand it and the objection the fishermen have is that on account of the fact that on flood tide the nets are liable to be drawn in there on the trap.

"A. No question about their going in there.

"Q. I am not denying that, I am not arguing with you at all, I say that is the objection to the trap is that because the flood tide for a period of fifteen minutes after the official tide table record, the nets do go in the channel there and are drawn on the trap site, is that it?

"A. Yes."

Witnesses Sanford Salo, Alfred Hauke, Albert Pernula, Jack Karna, and Emil Hedlund, gill net fishermen of many years' experience, testified on behalf of the plaintiffs concerning the danger of boats and nets being carried onto the Graham Fish Corporation trap.

The following is a brief summary of the evidence offered on behalf of the defendants concerning the above issue:

Odell Flake, a member of the Coast Guard stationed across the channel in a westerly direction from the trap involved herein, stated in one part of his testimony that he had observed several nets drawn into the Ilwaco channel but had never noticed any that had come up as far as the trap. He admitted, however, that, in 1933, they had had occasion to take up two nets on the Island Fish Company's traps, the most southerly of which is 900 feet north of the Graham Fish Corporation trap.

Clarence Anderson, also a member of the Coast Guard, testified that he had seen many nets go into the channel but that none of them came within 2,000 feet of the trap. He also testified that, in 1933, he had helped pull two nets off the traps north of the one in question.

Ralph Grable, who attended trap for the Graham Fish Corporation and who has had 43 years' experience as a fisherman, testified that he had never seen any net in the channel within 1,000 feet of the trap.

W. A. Smith, an employee of the Oregon State Fish Commission, who has charge of the state fish patrol boat, testified that he had never seen fishermen drift anywhere near the trap, although he had observed many fishermen "taken inside the channel".

Charles Graham, president of the defendant Graham Fish Corporation, testified that he had never observed any gill net fishing in the channel and that none of the nets which were drawn in through the mouth of the channel ever came within 2,000 feet of the trap. He also testified that, in his opinion, a trap is not "dangerous to a net".

We have read the record several times and are convinced that it is established by the preponderance of the evidence that the trap operated by the defendant company is a danger and a menace to the gill net fishermen while engaged in picking up their nets. In our opinion, the trap is so located as to constitute an unreasonable interference with the common right of fishery. When the salmon run is heavy in July and August, approximately 1,000 boats ply back and forth with the ebb and flood of the tide in the lower Columbia river in quest of fish. These fishermen assume great risk in following the fish. It is, indeed, a hazardous occupation. We think

it should not be made more so by placing traps in such position as to unreasonably interfere with the fishermen in the picking up of their nets—which, in our opinion, is a part of their fishing operations.

It follows that the decree of the lower court is reversed and one will be here entered enjoining the maintenance and operation of the trap in question, and directing that it be removed.

Plaintiffs are entitled to costs and disbursements.

CAMPBELL, C. J., and KELLY, J., not sitting.