Argued July 18; modified October 24, 1933; rehearing denied
January 9, 1934

## STRANDHOLM *v.* BARBEY ET AL.

(26 P. (2d) 46)

*A. E. Clark,* of Portland (Clark & Clark, of Portland, G. C. & A. C. Fulton, of Astoria, R. R. Bullivant, of Portland, and I. H. Van Winkle, Attorney General, on the brief), for appellants.

*William P. Lord,* of Portland, and *A. W. Norblad,* of Astoria (Lord & Moulton, of Portland, on the brief), for respondent.

ROSSMAN, J. Our disposition of the assignments of error will be better understood if we precede our decision with a brief resume of the testimony. Sand Island, which is located near the mouth of the Colum-

bia river, is a low, narrow, uninhabited body of sandy soil about three miles long east and west. Adjoining it on the north are the waters of Bakers bay; to the south is the main channel of the Columbia river. For a further description of the island, its past use and its ownership, we employ the following taken from *Columbia River Packers Assn. v. United States,* 29 Fed. (2d) 91:

"Sand Island is within the limits of the state of Oregon, and the adjacent tide and shore lands, up to high-water mark, originally belonged to that state. Washington v. Oregon, 211 U. S. 127, 29 S. Ct. 47, 53 L. Ed. 118; Shively v. Bowlby, 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331. April 21, 1863, by order of the President, the island was set apart or reserved for military purposes, and October 24, 1864 (Sp.Laws Or.1864, p. 72) the state of Oregon passed an act granting to the United States 'all the right and interest of the state of Oregon in and to the land in front of Ft. Stevens and Point Adams, situate in this state, and subject to overflow between high and low tides; also to Sand Island, situate at the mouth of Columbia river in this state; the said island being subject to overflow between high and low tide.' The island has never been used by the United States for military purposes, but June 19, 1880, officers of the United States army, acting under the orders of the Commanding General of the Department of Columbia, leased the island for general fishing purposes for one year and the lease was renewed for four years thereafter. The leasing was then discontinued, apparently for want of authority on the part of the army officers or the War Department to execute such leases. Later, by the Act of July 28, 1892, (27 Stat. 321; 40 USCA § 303), the Secretary of War was authorized, when in his discretion it will be for the public good, to lease for a period not exceeding five years, and revocable at any time, such property of the United States under his control as may not for the time be required for public use, and for the leasing of which there is no authority under

existing law; such leases to be reported annually to Congress. Pursuant to the authority thus conferred, the Secretary of War has leased the island and the adjacent tide and shore lands for fishing purposes since 1903.''

The plaintiff, a resident of Astoria, is a licensed fisherman in the lower Columbia river who catches salmon by means of a gill net. For a description of such a net and the manner in which it is operated, as well as of seine nets and fish traps, to which we shall later refer, see *Monroe v. Withycombe,* 84 Or. 328 (165 P. 227). The defendants, H. J. Barbey and Columbia River Packers Association are salmon cannery operators and are also engaged in the catching of salmon with seine nets.

Most of the south shore of Sand Island is well adapted to the operation of seine nets, and, for convenience, has been divided into five subdivisions or sites. All of these sites are of approximately equal length. A better understanding of the facts will be obtained by reference to the sketch which follows:

March 27, 1930, the Secretary of War, as party of the first part, and the defendants, Barbey and the Columbia River Packers Association, as parties of the second part, executed an instrument, the material portions of which are the following:

"The Secretary of War, by virtue of the authority conferred on him by the Act of Congress approved July 28, 1892 (27 Stat. 321), entitled 'An Act authorizing the Secretary of War to lease public property in certain cases,' and in consideration of the rental of THIRTY-SEVEN THOUSAND ONE HUNDRED AND SEVENTY-FIVE ($37,175.00) DOLLARS per annum, payable in four equal installments in advance on the first day of May, August, November and February of each and every year during the continuance of this lease, hereby leases to the parties of the second part (hereinafter designated as the lessees), for seining purposes only, for a period of five (5) years commencing May 1, 1930, but subject to revocation at will by the Secretary of War, the land on the south side of the SAND ISLAND MILITARY RESERVATION, Oregon, estuary of the Columbia River, described as follows: All of that certain premises on the south shore of Sand Island, together with rights easements and appurtenances thereunto belonging, known as Sites Nos. 1, 2, 3, 4, and 5 * * * subject to the following provisions and conditions: * * *"

Here follow nine paragraphs, the first of which requires "the lessees" to pay "the rental" in advance and to pay any sums expended by the United States after the termination or revocation "of this lease in putting the premises or property hereby authorized to be used and occupied in as good condition" as they were at the time of the execution "of this lease". The second condition is as follows: "The use and occupation of the demised premises shall be subject to such rules and regulations as the Commanding Offi-

cer, Fort Stevens, Oregon, may from time to time prescribe.'' The third condition permits ''the lessees'' to erect ''such temporary structures for the housing of their employees, animals, etc. as are absolutely necessary in connection with the seining operations; provided that the number, location and dimensions of such structures shall be subject to the approval of the said Commanding Officer, and all work incident to their construction shall be performed under his supervision. In addition to such approval the lessees shall, prior to the construction of any structures below the high-water line, obtain a permit from the War Department in accordance with Section 10 of the Act of March 3, 1899 (30˙ Stat. 1151)''. The remaining conditions prohibit ''the lessees'' from making excavations upon the demised premises, confine the lessees in their use of the island to the limits of the demised premises, prohibit the lessees from bringing any intoxicating beverages to the island, require them to furnish a bond conditioned upon their faithful performance of the conditions ''of this lease'', subject to the privileges granted by the instrument to the rights of two Indian tribes, acknowledged in two treaties mentioned in the instrument, and define the rights of the parties upon the expiration or revocation of ''this lease''.

Early in the spring of 1930 the defendant Barbey opened negotiations with the War Department of the federal government for permission to construct a wharf extending 1,100 feet southerly from the high-water mark of the south shore of Sand Island. April 2, 1930, he filed with the Master Fish Warden of this state three applications for licenses to construct three fish traps (see § 40-503, Oregon Code 1930) in the waters adjacent to the south shore of Sand Island, and at ap-

proximately the same time applied to the United States Engineer of the War Department for approval of the proposed construction of the three fish traps. We shall not define the location of the four proposed structures in the language of the applications, but confine ourselves to the statement that the sites of all four proposed structures were within seining Site 5. The applications provoked immediate objections from gill net fishermen, cannerymen and navigators of small craft. The Columbia River Fishermen's Protective Union, an association of gill net fishermen of which plaintiff is a member, enacted a resolution which recited:

"Such proposed dock and such proposed trap and such proposed three pound nets above described, on account of extending out into the waters of the Columbia River generally used for gill net fishing, will greatly interfere with the operation of gill net fishermen in a location of the Columbia River which has been used by such gill net fishermen for at least seventy continuous years in the past, and will greatly interfere with the navigation and operation of gill net fish boats * * * and will greatly impair, if not destroy, one of the most valuable gill net fishing grounds on the lower part of the Columbia River * * *."

Before this resolution was delivered to the officials before whom the applications were pending, various cannerymen and navigators of small craft attached their signatures to it.

May 24, 1930, the United States Engineer issued to Barbey a permit to construct and maintain a pile and timber wharf extending 900 feet south from the high-water line of Sand Island at a location which we have endeavored to approximate in the above sketch. When Barbey's applications for the trap licenses were brought to the attention of the State Fish Commis-

sioners, the aforementioned remonstrance was delivered to them, and some of the objectors who were present protested against the grant of the licenses. The commissioners, therefore, concluded to view the south shore of Sand Island before disposing of the applications, and when this intention was announced the fishermen decided that they would drift a net over the Sand Island course for the purpose of demonstrating that the proposed structures, if built, would destroy their course. Two of the commissioners appeared at the proposed sites of the Barbey structures, but, due to some misunderstanding, appeared before the fishermen were prepared to demonstrate. However, a gill net fisherman finally appeared, and at once insisted that the commissioners ought to postpone the demonstration drift for two hours so that the currents produced by the tide would be those normally present when drifts are made. When the commissioners declined to wait he proceeded with the drift and his net was carried 1,000 feet south of the most southerly point of the proposed wharf.

June 10, 1930, the Fish Warden issued the three licenses requested by Barbey, and June 16, 1930, the United States Engineer granted Barbey the privilege of proceeding with the erection of the traps. Shortly after the receipt of these permits Barbey commenced the erection of the structures and completed them about the middle of August. The total cost was $8,-000.00. One of the traps extended into the water 900 feet, another 735 feet and the third 250 feet. The above sketch affords an idea of the location of the traps and their extension into the channel. The water at the southerly end of the wharf is 9 feet deep at low tide.

It will be observed from the facts previously stated that the wharf and three traps are built in the easterly

portion of the island. Extending northward from the north shore of the island at approximately its central part are three wharves (indicated on our sketch) which were built some years before Barbey and the War Department signed the instrument above mentioned. Barbey, as a witness, explained the necessity for building the new wharf by stating that at low tide the three north docks are about 1,000 feet from the ebb tide. According to his testimony, Bakers Bay is continually shoaling, and it is now impossible for his cannery tender, which draws six and one-half feet of water, to reach the north docks at any time except high tide. This limitation upon the operation of his vessels, according to Barbey, subjects him to expensive inconvenience. During the fishing season he employs upon the island 150 men and 60 horses in the operation of his seine nets. His cannery tender transports to the island, besides the men and the horses, food and supplies for them, and brings from the island to his cannery at Astoria the salmon caught by the seining operations. The south shore dock, since it reaches an adequate depth of water at all stages of the tide, enables Barbey to bring to his cannery the fish caught in the island seining operations in continuous quantities.

The defendants contend that the plaintiff failed to produce any substantial evidence indicating that gill net fishermen had ever drifted their nets over the water where the wharf and the three traps now stand. They produced testimony indicating that the reverse of this was true. We shall, therefore, set forth a brief review of the testimony of some of the plaintiff's witnesses upon this issue.

The plaintiff testified that in 1912 he began fishing the Sand Island beach drift, and had done so con-

tinuously, with the exception of three years, until the construction of the Barbey wharf. He testified that he had been accustomed to place his net in the water at a point approximately two miles west of the dock and very close to the shore, and then drift with the flood tide until he had reached a point about one thousand feet east of the wharf when he began removing his net from the water. He swore that if he attempted to use that drift at the present time the current would carry his net directly into the piling of the westerly trap and of the wharf. Referring to the use made of this drift by other fishermen, he testified that it "seems to be full of boats all the time". He added that the place over which he and these others had been accustomed to drift their nets is now occupied in part with the Barbey traps and wharf. In explaining the value to fishermen of the right of drifting close to the south shore he explained that the fish "crowd in pretty well along the shore". He expressed the belief that this drift is as valuable as any with which he was familiar. He swore that the presence in this place of the piling and timbers which constitute the traps and wharf endanger the nets which cost $800.00, and the safety of the fishermen. He explained that when a net drifts into piling it is impossible to remove it without tearing it, and that when a fisherman's boat collides with the piling there is grave danger that it will capsize, throwing the occupants into the water. Apparently much of the drifting is done at night and frequently during periods of foggy weather. Axel Finney, a gill net fisherman, testified that fishermen have drifted their gill nets along the south shore of Sand Island since 1889. He testified that he drifted his net so close to the south shore that the inshore extremity was in water so shallow that his boat touched bottom. He testified that

fishermen use this course in such large numbers that "they (their nets) were laying very close together". He swore that the dock and traps were located directly in the course of the established drift. John Winters testified that he began drifting a net along this course thirty years ago and that after the Barbey structures had been built the current drew his net into the piling before he could remove it from the water, thereby causing him to lose 15 or 20 fathoms of net. Axel Fox, testified that he too employed this course and that the action of the current, which varied, would frequently cause a net to drift against the Barbey structures. In describing the value of the course, he testified: "I have been making my living there. I have been fishing there thirty years and I got enough for everybody." But added that the Barbey structures rendered it impossible for him to fish there any longer. Albert Rosh testified that since 1901 he had drifted his net along the south shore and would lay the inshore end of the net nine fathoms from the shore. He described the action of the current and tide as the fishermen approach the easterly end of the island, and added, "The tide sets me on these traps." He swore that this course is "a good fishing ground at certain tides, especially late tides". Otto Wiss testified that since 1905 he has drifted his gill net in the vicinity of Sand Island, and that on August 25 he caught 1,742 pounds of salmon while drifting the course where the dock and traps are now located. He expressed the belief that this course is "the very best fishing ground" in the river and that "the whole Ilwaco bunch" fishes it. His experience had shown him that the traps were a danger to the fishermen's nets. We shall not pause to set forth a further review of the testimony of the other gill net fishermen, several in number, whose testimony was

similar to that reviewed above. The defendant called witnesses who testified that the portion of the shore waters where the dock and traps are now located had never been employed by gill net fishermen. They testified that the action of the current carried the nets 2,000 feet or more from the shore as the drifting nets approached Site 5. They also testified that the water adjacent to Site 5 was very shallow due to a shoaling condition, and that in these shallow waters were numerous hidden snags which would constitute a menace to the drifting gill nets.

The able circuit court judge who presided over the trial in the circuit court had not only the advantage of seeing the witnesses, but also of viewing Sand Island and the activities conducted along its south shore. Such a view is a distinct advantage in determining whether the location occupied by the Barbey structures constituted a valuable drifting course. Since the trial judge resolved this issue in favor of the plaintiff, we are strongly persuaded to do the same.

■ The defendants, after pointing out that the right of fishing in the lower Columbia river is a right common to the entire public, contend that the evidence indicates that the plaintiff has suffered no special and peculiar injury differing in kind from that suffered by the public, and that, therefore, he cannot maintain this suit. Section 40-313, Oregon Code 1930, directs that the Master Fish Warden shall not grant a license to any person for the maintenance of a fish trap in a location where it will interfere with a prior right of fishing. Article I, section 20 of the Oregon Constitution, which prohibits the grant of privileges which are not equally available to all citizens, has been construed by this court as rendering illegal the maintenance of a trap at a place previously employed by gill net fisher-

men. *Driscoll v. Berg,* 137 Or. 499 (293 P. 586, 1 P. (2d) 611). This court, upon many occasions in the past, has entertained suits instituted by gill net fishermen wherein they sought to restrain the maintenance of traps and other devices which interfered with their established rights. Two recent decisions are *Radich v. Fredrickson,* 139 Or. 378 (10 P. (2d) 352), and *Driscoll v. Berg,* supra. The facts that gill net fishermen, before proceeding with their drifts, must pay to the state the license fees exacted by section 40-515, possess the qualifications demanded by section 40-512, and obtain the license required by section 40-503, Oregon Code 1930, are sufficient, in our opinion, to subject them to injuries differing in kind from those sustained by the general public, when their drifting course is invaded by a fish trap or other structure. We find no merit in this contention.

From the above it is seen that Barbey built his four structures in a location over which the plaintiff and his fellow fishermen had, for more than a half century, drifted their gill nets, and that Barbey's act has inflicted upon the plaintiff the kind of an injury that enables him to maintain this suit. We, therefore, face the inquiry whether Barbey may maintain his structure notwithstanding the above facts. We shall first consider the wharf, because the defendants virtually concede that if the wharf cannot be maintained the traps must be abandoned also.

▮▮▮ The defendants submit that Barbey is a lessee of the United States of America, owner of Sand Island, and that as such he possesses a sufficient estate in the island to confer upon him the rights which riparian owners possess to wharf out from the shore line to navigable waters. By reverting to the document, signed March 27, 1930, from which we have previously quoted,

it will be observed that the instrument restricts Barbey in his use of the island to a single purpose: "for seining purposes only." Even this single use is "subject to such rules and regulations as the Commanding Officer, Fort Stevens, Oregon, may from time to time prescribe". The instrument authorizes Barbey to erect such temporary structures as are "absolutely necessary in connection with the seining operations', but provides that he cannot avail himself of this privilege without first securing the approval of the aforementioned army officer. Again reverting to the aforementioned instrument, it will be observed that the rights which it grants are "subject to revocation at will by the Secretary of War" although the term designated in the instrument is the period of five years; in other words, the right which it grants to Barbey—to operate his seine nets upon the island—is revocable at will, but if a revocation is not announced within five years of the execution of the instrument Barbey's right expires by mere lapse of the five-year period of time. It seems evident that this instrument, which permitted Barbey to use the island for a single purpose only, and which required him to vacate upon a momentary revocation, granted to him no interest or estate in the land. It merely authorized him to perform acts upon the island which would have constituted trespasses but for the protection afforded by this document. A license, unlike a lease, conveys no estate in the affected property and is generally revocable at will without notice. The right conferred by a license upon the licensee is generally personal to him, and, therefore, is not the subject of transfer. The document before us appears to confer upon Barbey a personal right, for it nowhere employs the terms generally found in deeds and leases where a transferable right is granted. A licensee, un-

like a tenant, is not entitled to possession; this remains in his licensor. It merely authorizes the licensee to go upon the land for the purposes specified in the instrument creating the license—for instance, seining. If the instrument styles itself a lease and employs words commonly found in leases, like lessor, lessee, etc., we have circumstances which indicate that the authors intended to create the relationship of landlord and tenant, but those circumstances are not controlling. Tiffany, Landlord and Tenant, § 7 (footnote 119). The courts construe the whole mass of words and not merely some of them.

The fact that the questioned rights are to be exercised upon a military reservation; the fact that the right is (1) personal to Barbey and the Columbia River Packers Association; (2) revocable at will; (3) permits the grantees to use the island for a single purpose only; (4) does not confer upon the grantees possession of the island; and (5) the fact that the right conferred stops short of granting to Barbey and his associates an estate in the land convinces us that the instrument creates a license and not a lease. *Forsyth v. Nathansohn,* 139 Or. 632 (9 P. (2d) 1036, 11 P. (2d) 1065). Such being our conclusion, Barbey was not a riparian owner, and, since he was not, his argument, based upon the assumption that he was a riparian owner and therefore entitled to wharf out to navigable water, fails.

 The license which the United States Engineer issued to Barbey (pursuant to 33 USCA § 403; 30 Stat. 1151) authorizing him to proceed with the construction of the wharf was a mere declaration that the structure would not interfere with or be detrimental to navigation, and was not a declaration by authority of Congress that he could erect the wharf without first ob-

taining authority from the state of Oregon. *Hubbard v. Fort,* 188 Fed. 987; *Thlinket Packing Co. v. Harris & Co.,* 5 Alaska 471; *Columbia Salmon Co. v. Berg,* 5 Alaska 538; *Sullivan v. Booth & Flinn,* 210 App. Div. 347 (206 N. Y. S. 360). The title to the bed of the river is in the state of Oregon. *Columbia River Packers' Association v. United States,* supra, and *Hume v. Rogue River Packing Co.,* 51 Or. 237 (83 P. 391, 92 P. 1065, 96 P. 865, 31 L. R. A. (N. S.) 396, 31 Am. St. Rep. 732). It is evident that Barbey possesses no authority for the maintenance of any part of the wharf which extends beyond low-water mark. We are, therefore, satisfied that, since the wharf interferes with long-established fishing rights possessed by the plaintiff, he is entitled to a decree enjoining the maintenance of the wharf beyond the line just mentioned.

The licenses issued by the Oregon Master Fish Warden for the maintenance of the three fish traps have already expired. They were issued in the belief that the wharf would render this adjacent water unsuitable for gill net operations. Since we affirm the portion of the decree which requires the removal of all portions of the wharf which extend beyond low water, it follows that we also affirm the portion of the decree which requires the removal of the traps.

■ The decree should not enjoin the Fish Commission from the further performance of their duties at the location occupied by the traps and wharf. The decree should be modified by eliminating from it the portions which enjoin the Fish Commissioners. The cause will be remanded to the circuit court with directions to enter a suitable decree.

RAND, C. J., and BELT, J., concur.

BEAN, J., did not participate in this decision.