Argued September 12, affirmed November 28, motion to dismiss
appeal denied November 28, argued September 12,
affirmed November 28, 1956

# GEORGIA-PACIFIC CORPORATION *v.*
## MILLER ET UX

304 P. 2d 428
304 P. 2d 440
304 P. 2d 441

*Walter H. Evans, Jr.*, argued the cause for appellants. On the briefs were Krause, Evans & Lindsay, Portland.

*Norman J. Wiener*, Portland, argued the cause for respondent. With him on the briefs were King, Miller, Anderson, Nash & Yerke, Portland.

Before WARNER, Chief Justice, and ROSSMAN, LUSK, BRAND, PERRY and McALLISTER, Justices.

ROSSMAN, J.

This is an appeal by the defendants, Tim and Myrl Miller, from a decree of the circuit court which adjudged that:

> "Plaintiff, its successors and assigns, has and shall have an easement for the construction, operation, maintenance and use of a right of way for a logging railroad over and across the above-described lands, conditioned upon annual payment to defendants of the total sum of $36.74 * * *."

The tract to which the quoted words refer is owned by the defendants-appellants, who are husband and wife.

When the suit was instituted, the plaintiff was C. D. Johnson Lumber Corporation. May 13, 1953, before trial, that concern and three others, through an agreement of merger, created a corporate entity entitled Georgia-Pacific Corporation which succeeded to the rights and properties of its four predecessors. It has been substituted as the plaintiff-respondent. Hereafter, when we use the term plaintiff we will refer to C. D. Johnson Lumber Corporation, and when we use the name Miller we will mean the defendant, Tim Miller.

We will now sketch facts sufficient in extent to preface a statement of the issues presented by this appeal and having done so will complete the narrative of the facts. The fundamental issue is the nature of the right, if any, which the plaintiff-respondent has in the defendants' land. The circuit court held that it is an easement.

The defendants-appellants are the owners of the tract of land, 160 acres in extent, upon which, according to the challenged decree,

> "Plaintiff, its successors and assigns, has and

shall have an easement for the construction, operation, maintenance and use of a right of way for a logging railroad.''

The plaintiff, in 1941 and prior thereto, was the owner and operator of a sawmill which was located in Toledo and which secured its logs from a tract of timberland about eight miles distant. The logs were brought to the mill upon a logging railroad also owned by the plaintiff. In 1941 the plaintiff desired to extend its railroad a distance of twelve miles across some tracts which formed a portion of Siletz Reservation. The latter had been established in 1855 by Presidential order. A parcel of the land which the plaintiff wished to cross and which lay in the Reservation was the land now owned by the defendants. It was then owned by an Indian, Leo Umatata. Under the General Allotment Act of February 8, 1887 (24 Stat 388) as amended, the title to Umatata's allotted land was held by the United States Government as trustee for him. The same was true during the lives of Umatata's antecedents, Rose and Foster Umatata.

March 19, 1941, the plaintiff applied to the Secretary of the Interior for a right of way across Umatata's land, and July 25, 1941, was awarded a ''revocable permit.'' A similar course was pursued to gain the right to extend the logging railroad across the lands of other Indians which lay in the Reservation. Having secured the desired right of way, the plaintiff, in the fall of 1941, built the twelve-mile extension and expended in so doing $148,028.07. Ever since that time its trains have operated over the extension. Since 1942 the plaintiff has spent annually upon the maintenance of its right of way sums varying from $25,-972.32 to $49,501.00. The entire right of way, both the original and the extension, constitute an entire

logging railroad. The extension is, therefore, an integral part of the whole. August 27, 1951, the United States Government issued to Umatata fee patents whereby title to the tract in question was conveyed to him. The instrument of conveyance did not mention the right of way. September 19, 1951, Umatata conveyed title to Miller, who is not an Indian. The defendants, who had long lived in the vicinity of the railroad, were fully aware of the fact that the logging railroad right of way lay upon the land which they acquired. In August, 1952, the defendants posted upon the parts of the right of way which crossed their land No Trespass signs and in other ways asserted complete ownership of the property.

The complaint sought a decree (1) perpetually enjoining the defendants from obstructing the operation of the railroad; (2) "declaring plaintiff to be the owner of an easement for the construction, operation, maintenance and use of a railroad logging right of way" over the land owned by the defendants; (3) granting other equitable relief to the plaintiff. The decree, as we have seen, awarded the desired relief.

The defendants-appellants submit and argue in their brief these four propositions:

1. "The United States has no power to grant a permanent easement under the guise of a 'revocable permit.'"

2. "Defendant is not estopped from challenging plaintiff's title."

3. "By accepting revocable permission under conditions, plaintiff cannot obtain a permanent easement free of those conditions."

4. "There has been such a change of circumstances that in the event this court finds plaintiff's position correct on Proposition of Law 1 and 2,

this proceeding should be remanded for the taking of further testimony.''

The above states the issues submitted by the appeal.

The authority of the Secretary of the Interior over Indian lands is found in part in 5 USCA, § 485 and 25 USCA, § 2. The former provides:

"The Secretary of the Interior is charged with the supervision of public business relating to the following subjects and agencies:

"* * *

"10. Indians.

"* * *."

The other section of the federal statutes above cited says:

"The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations.''

The authority of the Secretary of the Interior to grant revocable permits to cross Indian lands is stated in 25 CFS, § 256.66, which reads:

"Revocable permission may be given by the Secretary of the Interior to construct and operate logging roads across Indian lands under the general supervisory authority over Indian affairs conferred upon him by R.S. 441, 463 (5 USC 485, 25 USC 2) upon such terms and conditions as he may deem fair and adequate under the circumstances of each particular case.''

Section 256.67 requires the location of a main-line logging railroad to be approved by the local superintendent and the Commissioner of Indian Affairs.

Section 256.68 demands that the application shall include a map in duplicate.

Section 256.69 requires a schedule of damages to be attached to the application, prepared in accordance with §§ 256.75 through 256.86, among which are requirements for the preparation of a damage schedule and the attaining of the consent of the Indian allottees.

The plaintiff's application conformed with the above requirements and that fact makes it seem that these were the sections under which it applied and under which the approval was granted.

March 17, 1941, plaintiff filed a petition with the Superintendent of the Siletz Indian Agency in Salem for permission to survey a right of way upon tribal and allotted lands in the Reservation which included those of Umatata. The petition stated that the plaintiff

"petitions for permission to survey or locate a right of way for a logging road over certain Indian allotments, and * * *

"Wherefore your petitioner prays that it may have permission to survey and locate a logging road over and across the Indian allotments above mentioned, and * * *."

There is no contention that the petition failed to comply faithfully with all regulations that pertain to papers of that kind.

March 29, 1941, the Assistant Secretary of the Interior sent to the Superintendent of the Siletz Reservation a telegram, reading:

"Permission hereby granted C. D. Johnson Lumber Corporation to survey logging road right of way across allotted and tribal lands and thereafter at own risk begin work thereon upon advance deposit double estimated damages and prior consent allottees and tribe subject prompt compliance applicable laws and regulations."

Shortly the Assistant Secretary sent a letter to the superintendent in which he referred to his telegram, and explained:

"The intent of this authority is that the company can make the survey without any deposit or the consent of the Indians, but that such deposit and consent will be necessary before it can begin actual construction work on the line."

April 18, 1941, the plaintiff filed with the local office of the Department of Interior a petition for authority to proceed with the construction work "on the right of way project" across the allotted and tribal lands. The document stated that the company had completed the survey and that its construction crew was working upon "its right of way where the same cross private lands adjacent to said Indian allotments and is now ready to commence construction on the right of way over said Indian lands." The petition was forwarded to the Secretary of the Interior.

A paper, entitled Memorandum of Damage Appraisal which was filed with the Bureau of Indian Affairs and which appraised the damages, is contained in the record, as is also the required map.

The record contains two documents each dated May 21, 1941, in which Umatata consented to the plaintiff's petition for a right of way. The two seemingly originated in the office of the superintendent. Both were transmitted to the Bureau of Indian Affairs July 7, 1941. Each bears the title Statement of Owner followed by the subheading Proposed Railroad Right-of-Way of the C. D. Johnson Lumber Corporation. Two entries upon the instruments are preceded by the designations Damage Valuation and Annual Rental Charges. Following the data that was entered in those categories

there appears upon one of the documents this statement:

"I, Leo Umatata, hereby acknowledge that the petition of the C. D. Johnson Lumber Corporation for a logging railway right-of-way over and across the above described land, has been explained to me by the Superintendent of the Grand Ronde-Siletz Indian Agency, Salem, Oregon, and I hereby consent to said right-of-way on payment of the appraised damages amounting to $54.70. It is understood that a flat annual or yearly rental charge of $13.70 will also be paid."

At that point Umatata subscribed his signature. The other document bore exactly the same superscription with the exception that the sums entered in it were, respectively, $81.50 and $23.04. It, too, was signed by Umatata.

May 15, 1941, the plaintiff deposited with the Superintendent of the Siletz Reservation the sums of money exacted by the telegram of March 29, 1941 and the subsequent letter.

According to a stipulation of the parties, which forms a part of the record,

"On May 27, 1941, the Siletz Tribal Business Committee considered the application of plaintiff as it affected tribal lands and suggested that certain conditions be stipulated by plaintiff and that thereafter on or about June 12, 1941, the plaintiff executed a certain document, of which Exhibit 14 is a true copy, and that said document was transmitted to the Commissioner of Indian Affairs * * * and that there was also forwarded a document executed by the Siletz Tribal Business Committee, of which Exhibit 15 is a true copy, and that Exhibit 16 is a true copy of the said letter of transmittal."

Exhibit 14, mentioned in the stipulation, bears this caption:

"Stipulation in connection with REVOCABLE PERMIT FOR THE CONSTRUCTION AND OPERATION OF A MAIN-LINE LOGGING ROAD"

The document bound the plaintiff to take specified fire precautions, to provide crossings over the railroad tracks for Indians and to permit Indians to use a truck road owned by the plaintiff for purposes mentioned in the paper. The latter, which pertained not only to the leave which the plaintiff sought to cross Umatata's land, but also other Reservation lands, bound the plaintiff to pay the sums of $1,461.25 and $536.18 as the appraised amount of damages. It also required the plaintiff to pay annually $380.18 as "a flat rental charge" covering "the individual allotments" and $161.38 "on the tribal reserve lands." The paper, in addition, provided:

"6. The grant of the right-of-way is accepted subject to the right of the United States and its agents with men and material to use and cross the same and works constructed thereon, for all protection purposes whatever, * * *.

* * * * *

"9. It is further understood and agreed by the company that this instrument is not a lease, but that it is a permission revocable in the discretion of the Secretary of the Interior; and that the permit shall not be revoked except for due cause and/or failure of the company to comply fully with the stipulations as set forth herein.

"10. This permit shall not be sublet, assigned, or transferred without the written consent of the superintendent.

"11. This permission and the stipulations cover all activities of the company that were undertaken

in the construction of the said roads under authority of Section 4 of the REGULATIONS OF THE DEPARTMENT OF THE INTERIOR CONCERNING RIGHTS OF WAY OVER INDIAN LANDS and prior to full compliance with the regulations.

"12. The company hereby consents to accept said right-of-way grant subject to the conditions of this stipulation and permission on the *12th* day of June, 1941."

Exhibit 15, which, as the stipulation of the parties recognizes, constitutes the recommendations of the Tribal Business Committee, declares that the committee

"* * * considered the application of the C. D. Johnson Lumber Corporation for permission to construct an all-weather truck logging road over the tribal reserved timber Sec. 16 * * * and consented to said road * * * upon payment of damages amounting to $538.18 plus an additional flat annual rental charge, * * * of $161.36 * * *."

The paper continues in this vein:

"And Whereas, a revocable permit dated June 12, 1941 covering the stipulations * * *

"Be It Resolved, Therefore, that said application of the C. D. Johnson Lumber Corporation for the construction of said road be granted subject to the conditions and stipulations in permit executed by said company on the 12th day of June, 1941, insofar as said tribal timbered section 16 is concerned."

The stipulation signed by the parties, from which we have quoted, mentions Exhibit 16, which is a letter signed by the Superintendent addressed to the Commissioner. Accompanying it were all of the foregoing papers with the exception, of course, of the stipulation

which the parties to this suit effected after the trial was begun. After the letter had enumerated the several documents and mentioned the charges which the plaintiff would have to bear, it said:

"The Indian lands involved are practically all open grazing or covered with scattering stands of second growth timber, and it is believed that the damages as assessed and accepted are fair and reasonable and fully compensate the Indians in the matter.

"I might further state that the Company's plans are to build a railroad to the approximate southwest corner of Section 20, in Township 9 South, Range 9 West, W. M., and from thence on north an all-weather truck road will be constructed. The construction of this truck road to and over the tribal lands will be an advantage to the Indians in that they will be permitted the continued use of the road. In fact, during the past several years, a truck road to the tribal area has been considered in connection with CCC-ID activities, but this office has never been able to secure an easement over adjacent deeded property and contemplated projects for such a road have had to be abandoned."

Of the sums payable annually by the plaintiff $36.74 was the amount exacted for use of the right of way.

July 21, 1941, the Commissioner sent the plaintiff's petition to the Secretary of the Interior for approval with a recommendation that read:

"The accompanying application for a logging railroad right of way is respectfully transmitted to the Secretary of the Interior, with the recommendation that it be approved as a revocable permit in accordance with 25 CFR 256.66 subject to the terms and conditions of the stipulations executed by the applicant on June 12, 1941 * * *."

July 25, 1941, the final approval of the application was given by Oscar Chapman, Assistant Secretary of

the Interior. It was endorsed upon a map which showed the course of the right of way and which bore explanatory matter. The approval was expressed in these words:

"The accompanying map is hereby approved as a revocable permit under the general supervisory authority over Indian affairs conferred upon the Secretary of the Interior by Section 441, Revised Statutes (5 USC 485) subject to the terms and conditions of the stipulations executed by the applicant on June 12, 1941; the payment of $541.54 annual rental; and fencing of the right of way through allotment 196."

Only one of the plaintiff's checks which remitted the annual charge identified the applications of the remittance with an entry upon the check. That one employed these words: "Annual Rental—Revocable Right-of-Way Permit." The receipts which the superintendent issued to the plaintiff generally identified the payments in this manner:

"Annual Rental:   *   *   *   Revocable Permit dated June 12, 1941, for the construction and operation of a main-line logging road; approved by Oscar Chapman, Assistant Sec. of the Interior, July 25, 1941: R/W, Siletz Reservation, Oregon."

While Leo Umatata owned the land he at times sent to the superintendent inquiries and in so doing referred to the right of way in this way: "for the Rideaway," "right way" or "the right away." The superintendent, in replying, spoke of "Right-of-Way, C. D. Johnson Lumber Corp." or "Right-of-Way on the Rose Umatata and Foster Umatata allotments."

On August 27, 1951, pursuant to Umatata's application, he received from the United States Government fee patents to the land. As we have said, the instru-

ment made no mention of the logging railroad. September 19, 1951, Umatata conveyed the land by warranty deed to the defendants. Miller, who had long lived in the vicinity and had known of the construction of the railroad when the work was underway, was familiar with the fact that the right of way lay upon the land which he was purchasing.

Umatata had accepted payment of the so-called rental charge for the year 1951, that being the year in which he received the fee patent which conveyed title to him. Neither then nor at any other time did he question the plaintiff's right to the continued use of the right of way.

The above is a portrayal of the facts.

The circuit court, as we have seen, decreed that the plaintiff had an assignable easement in the form of a right of way for the operation of a logging railroad over the defendants' land, conditioned upon the payment annually of the sum of $36.74 to the defendants. It granted an injunction to prevent the defendants from obstructing the easement.

We have mentioned the fact that Leo Umatata received fee patents to his land in August, 1951. Title was conveyed to him under the authority of 25 USCA, § 348. The defendants offer several arguments in an attempt to show that the permit was thereby revoked. They cite the language of the statute to the effect that the land is to be conveyed to the Indian "in fee, discharged of said trust and free of all charge, incumbrance, or restriction whatsoever." The defendants admit that, under provisions of the statutes applicable to Indian lands, the Indian can alienate his interest despite the foregoing language, but maintain that the "revocable permit" regulation is not such a provision.

Plaintiff counters by arguing that the language "free of all charge or incumbrance" applies only to charges made against the Indian's will, and cites for the proposition cases holding that state taxes can not be imposed upon allotted lands during the trust status. *United States v. Spaeth* (D.C. Minn), 24 F Supp 465; *United States v. Ferry County,* Washington (D.C. Wash), 24 F Supp 399; *Morrow v. United States* (CCA 8), 243 F 854. Plaintiff's position seems valid.

The defendants' next contention is that the issuance of the patent revoked the permit automatically because by its terms, so the defendants argue, the permit can exist only while the Secretary of the Interior has the power to revoke.

Plaintiff cites two cases to refute this argument, but both are distinguishable. In *Swendig v. Washington Power Co.,* 265 US 322, plaintiff power company was awarded injunctive relief restraining defendant from interfering with a power line, and obtained a declaration of its right to use the land traversed by the line. Plaintiff had constructed the power line through an Indian Reservation pursuant to a permit issued by and revocable in the discretion of the Secretary of the Interior. Defendant received patents to portions of said land, none of which mentioned the power line, and thereupon denied the power company's right to operate and maintain the line. The decree was affirmed. The distinguishing factor between this case and the instant one is that the question of revocability of the permit by the issuance of a patent was specifically covered by a regulation. The applicable regulation stated that final disposal of the land was not to be construed as a revocation of the permit, and that the revocation must be specific. This regulation super-

seded an earlier one which stated that final disposition of the land automatically revoked the permission.

*Washington Water Power Co. v. Harbaugh,* 253 F 681, is to the same effect. The court there quoted from a letter written by the Secretary of the Interior when the change in regulations above mentioned was contemplated. The secretary based the change on an attempt to carry out the intent of Congress.

In the case at bar, there are no regulations which govern the effect upon "revocable permits" of the issuance of patents, and no evidence of the intent of Congress since 25 CFR, § 256.66 was promulgated.

The two cases just distinguished are the only ones which have been cited by counsel on this point. Defendants present none which held that the issuance of a patent automatically cancels an outstanding "revocable permit." We are aware of no reason for attributing to the issuance of the patent involved in this case a result of that kind. The logging railroad was still needed after Umatata received the patent, and there is nothing in the record which intimates that when the permit was issued either the plaintiff or the Secretary of the Interior intended that Umatata could destroy the plaintiff's rights by applying for and receiving a patent. We recall that it was agreed before the plaintiff built the twelve-mile extension that the permit, if such is its character, could not be revoked "except for due cause and/or failure of the company to comply fully with the stipulations as set forth herein." There is no claim that the Secretary of the Interior intentionally revoked the permit for any cause whatever.

The disposition of this case, in our estimation, rests upon a determination of the nature of the right which

the plaintiff received through the action taken by the Secretary of the Interior July 25, 1941. On that day he endorsed upon the map which showed the course of the planned railroad the words, "is hereby approved as a revocable permit * * * subject to the terms and conditions of the stipulation executed by the applicant June 12, 1941; * * * and fencing of the right of way through allotment 196."

The term "revocable permit", although it occurs in the Agency Regulations, appears to have been an unfortunate one for denoting the nature of the right which was given. We have mentioned the fact that before the Secretary took his action on July 25 the plaintiff, on March 17, had petitioned for the privilege of entering upon the lands of Umatata and of others for the purpose of surveying a route for the contemplated railroad. March 29 the Assistant Secretary granted the permission. Then the survey was made. April 18 the plaintiff filed another instrument in which it stated that the survey had been completed and that the plaintiff wished authority to proceed with the construction work. That paper was accompanied with a map which showed the course of the desired right of way. In the meantime, other documents of which we have taken notice were filed, resulting, on July 25, in the endorsement by the Secretary upon the map of the words which we have quoted. They constituted the final grant. Powell on Real Property, § 427, gives attention to the term "revocable permission." It says:

"* * * A substantial amount of confusion in the law is traceable to the use of such terms as 'licenses coupled with an interest,' 'irrevocable licenses,' 'executed licenses' and similar expressions. That which is important is the *existing* relationship between the parties. The relationship may have *begun* with a revocable permission, but if that per-

mission has been followed by events which have eliminated its revocability, it is submitted that the *existing* irrevocable relationship should no longer be called a license, but rather an easement, as it truly is.''

■ Accordingly, we see that terms such as ''revocable permission'' and ''revocable permit'' are appropriate to designate the beginning of a relationship or the beginning of a course of construction work; that is, they authorize the licensee to enter upon another's land and pursue there a course of action, such possibly as building a road. But for the permit the conduct would constitute a trespass. Thus, as normally used, the terms ''revocable permission'' and ''revocable permit'' denote a license. However, as Powell indicates, a new problem arises when the licensee, after entering upon the land, has built the contemplated road. The improvement placed upon the land under the permit may demand, so Powell indicates, that the existing situation ''should no longer be called a license, but rather an easement.'' In the present instance, the plaintiff, after receiving the revocable permit, entered upon Umatata's land and expended $148,028.07 in the construction of the railroad. If the term ''revocable permit'' is synonymous with ''license,'' then the plaintiff's expenditure of that substantial sum of money, in accordance with plans which were displayed when the ''revocable permit'' was issued, requires a holding that the existing relationship ''should no longer be called a license, but rather an easement.'' See for a result to that effect *Baum v. Denn,* 187 Or 401, 211 P2d 478.

■ However, more than a construction license, according to our belief, was in the mind of the Assistant Secretary July 25. At that time he not only authorized the construction of the railroad, but also prescribed

the rules which would thereafter govern the rights of the parties in their relationship with each other. He wrote into the paper which he signed July 25, 1941, these words: "subject to the terms and conditions of the stipulations executed by the applicant on June 12, 1941." The terms and conditions which were set forth in the paper of June 12 included several of benefit to the landowner but they also specified that "the permit shall not be revoked except for due cause and/or failure of the company to comply fully with the stipulations as set forth herein." Since the plaintiff's rights in the land could not be "revoked except for due cause and/or failure of the company to comply * * *," they were not at the will of the owner of the land. In contrast to that situation, Restatement of the Law, Property, § 519, states:

"A license is terminable at the will of the possessor of the land subject to it."

The section just cited contains exceptions which we omitted from the quotation because they are not germane. The circumstances of which we have just taken notice indicate that something more than a license was granted to the plaintiff. The words which we quoted from the grant made by the Assistant Secretary July 25 make provision that the "revocable permit" was transferable if the written consent of the superintendent to a transfer was appended to it. Licenses, generally, are not transferable. *Strandholm v. Barbey,* 145 Or 427, 26 P2d 46; *Ewing v. Rhea,* 37 Or 583, 62 P 790; Thompson on Real Property, Perm Ed, § 713; Powell on Real Property, § 428. That incident also indicates that something other than a license was in the minds of the parties when the term "revocable permit" was used. We will now give attention to another factor

which possibly indicates what the Secretary of the Interior had in mind.

■ The object of the negotiations which the plaintiff and the Secretary of the Interior began March 17 was a right of way for a railroad. The term "right of way" was constantly upon their tongues as the plaintiff and the Secretary conducted the negotiations. The "revocable permit" was endorsed upon a map which depicted the entire course of the right of way. Lettered upon the map was a certificate of the president of the C. D. Johnson Lumber Corporation which vouched for the accuracy of the map and in which he stated:

> "* * * this map has been prepared to be filed for the approval of the Secretary of the Interior in order that the applicant may obtain the benefits of the Act of Congress, approved March 2, 1899, entitled 'An Act to provide for acquiring rights of way by railroads through Indian reservations, Indian lands and Indian allotments and for other purposes.' "

The revocable permit incorporated within itself the stipulation which seven times uses the term "right of way." More than once the stipulation accompanies the term "right of way" with the word "grant." In at least one instance it speaks in this way, "through which this right of way is granted." The term "grant" is historically the right word to employ in the creation of an easement. Powell on Real Property, § 407, says:

> "The word 'grant' was the traditionally appropriate word for the creation of an easement. * * * The word 'grant' is still most commonly used * * *."

As we have indicated, the object of the negotiations which were begun March 17 was to secure a railroad right of way. In determining the nature of the right

which was created by the Secretary of the Interior July 25, 1941, the fact that he granted to the plaintiff a right of way for a railroad is highly important. The grant authorized the construction of a twelve-mile extension to its existing railroad so that it would be able to reach a large stand of timber and bring to the mill the logs secured from the stand. It was manifest that the plaintiff would need the right of way for an unforeseeable number of years and that it would be required to expend in construction of the roadbed a large sum of money. To justify the expenditure the plaintiff needed assurance that the right of way could not be taken from it without due cause. Further, it was apparent that the plaintiff would require the exclusive possession of the land constituting the right of way, for common observation shows that railroads must have sole possession of the right of way in order to promote safety of operation. According to 44 Am Jur, Railroads, § 129, p 341:

"Generally speaking, the dominion of a railroad corporation over its trains, tracks and right of way is no less complete or exclusive than that which every owner has over his own property. An easement of right of way granted to a railroad company is essentially different from any other. The nature of railway service requires exclusive occupancy. And it is well settled that a railroad company is entitled to the uninterrupted and exclusive possession and occupancy of its tracks and all of its rights of way necessary for conducting its business, * * *."

The singular character of an easement which a railroad company possesses is indicated by the following which we take from 18 Am Jur, Ejectment, § 15, p 18:

"Contrary to the rule as to rights of way generally, an action of ejectment will ordinarily lie for interference with the possession of a railroad

right of way, even where the right of the railroad company is technically an easement.''

See, to like effect, 28 CJS, Ejectment, § 13, p 859. The much-cited case of *Central Pacific Railroad Co. v. Benity*, 5 Sawyer 118, is of interest. It was an action of ejectment. The railroad acquired its easement by an act of Congress which spoke of ''right of way.'' We take the following from the statement preceding the decision:

''This is a demurrer to a complaint in ejectment. The complaint states that by virtue of the act of congress of July 1, 1862, plaintiff is entitled to the possession of a certain tract of land (describing it) for railroad purposes, 'being that portion of plaintiff's right of way, situated,' etc. Section 2 of the act referred to provides: 'That the right of way through the public lands be, and the same is hereby, granted to said company for the construction of said railroad and telegraph line; * * * said right of way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass over the public lands.'

''The point raised by the demurrer is that the plaintiff's interest in the land is a mere easement, for the recovery of which ejectment will not lie.''

The court ruled:

''We think it clear that the plaintiff, under its grant, has a right of entry upon and possession of the land in question, and that this right of possession is necessarily an exclusive right, as against all certainly, besides the United States, and gives the plaintiff such a legal interest in the land as enables it to maintain an action like the present, to recover the possession from one who has wrongfully entered thereon.''

In *Pennsylvania Schuylkill Val. R. R. v. Reading Paper Mills*, 149 Pa St 18, the court defined as follows

the nature of the easement which a railroad acquires for right of way purposes:

"* * * Such title is sometimes called an easement, but it is a right to exclusive possession, to fence in, to build over the whole surface, to raise and maintain any appropriate superstructure including necessary foundations and to deal with it within the limits of railroad uses as absolutely and as uncontrolled as an owner in fee. There was no such easement at common law, and it may well be doubted if it is not a misnomer to extend to this newly-invented interest in land the name of easement, perhaps appropriate enough to the railroad's ordinary right of way for its tracks. It would seem to be rather a fee in the surface and so much beneath as may be necessary for support, though a base or conditional fee, terminable on the cesser of the use for railroad purposes. But whatever it may be called it is in substance an interest in the land special and exclusive in its nature and which may be the subject of special injury by the obstruction of access to the abutting street, and therefore within the rule which governs the application of equitable relief. The right of exclusive possession includes the right of ingress and egress from the street, and in this respect the injury is exactly the same as to a tenant for life or for years, whose right to relief would be unquestionable, and is entirely different from the general right of the public to pass along the street."

In 30 Oregon Law Review 380, Note and Comment, the writer says:

"In conclusion, it may be said that a railroad right of way most closely resembles an estate upon a special limitation, that is, one limited to railroad uses. Assuming that a railroad company has been granted a tract of land and that the granting clause of the deed reads, 'that the grantee shall have and hold so long as the land shall be used for railroad

purposes only,' it would appear from what little the courts have said, that the nature of the use, and its duration, would be comparable to the nature and duration of the use shown by the cases herein examined in which the railroad companies hold an interest the courts call an 'easement' or 'right of way.' But the analogy between an estate on special limitation and an 'easement' is imperfect. A distinction can be made because the two interests are often created by different means. A further distinction can be made in that the railroad companies may be able to make uses of land granted to them upon a special limitation which they could not make if they held a mere 'easement' or 'right of way.'"

In *Powers et ux. v. Coos Bay Lumber Co.,* 200 Or 329, 263 P2d 913, we bestowed much attention upon the problem as to the nature of the right which is denoted by words that speak of a railroad right of way. In expressing ourselves, we employed the phrase, "in the nature of an easement." We believe that the right granted for such purposes ends when the use terminates. It entitles the grantee to exclusive possession and enables him to maintain actions of ejectment.

We shall give no further attention to the authorities. In our opinion, the action which was taken by the Secretary of the Interior July 25, 1941, placed a servitude upon Umatata's land which subjected it to the railroad right of way as long as the right of way is employed for the transportation of logs. The servitude is available only as long as the plaintiff and its successors meet the conditions which are specified in the writing of July 25, such as the payment of the annual charge and the maintenance of protection against fire hazard.

The above disposes of all contentions advanced by the appellants, with the exception of the one in which

they suggest that, through the merger which we have mentioned, a larger volume of timber may be hauled to the mill upon the railroad. However, the merger was effected before the trial, and the permission which was given to the plaintiff did not restrict it to any given quantity of timber.

The decree of the circuit court is affirmed. However, in order to avoid misunderstanding, we add that our conception of the nature of the respondent's rights in the property is somewhat different from that of the trial judge. We believe that we have sufficiently portrayed the nature of the respondent's rights. These rights are subject to all of the limitations expressed in the aforementioned stipulation and continue only so long as the right of way is used for the hauling of forest products.

**ON MOTION TO DISMISS APPEAL**

Krause & Evans, Portland, for the motion.

King, Miller, Anderson, Nash & Yerke, Portland, contra.

Before WARNER, Chief Justice, and ROSSMAN, LUSK, BRAND, PERRY and MCALLISTER, Justices.

ROSSMAN, J.

This cause is before us upon a motion filed by the defendants-respondents for an order "dismissing plaintiff-appellant's appeal herein upon the ground and for the reason that plaintiff-appellant has taken possession of the property and proceeded to exercise the right condemned by it * * *."

The action which culminated in the motion under consideration was filed pursuant to ORS 376.505 through 376.540, for the purpose of acquiring and condemning a strip of land for a logging road. The trial of the action resulted in the entry of a judgment in the sum of $4,026.20 which the plaintiff refused to pay.

After the plaintiff had refused to pay the judgment just mentioned and had given notice of appeal, the defendants-respondents filed the pending motion and accompanied it with an affidavit which shows that the plaintiff is daily in use of the land which constitutes

the subject matter of the condemnation action. ORS 35.120 says:

"Either party may appeal from the judgment in like manner and with like effect as in ordinary cases, except that the plaintiff may not appeal after he has paid the damages into court and has taken posssesion of the property or proceeded to exercise the right condemned,   *   *   *.''

The defendants-respondents contend that since the plaintiff-appellant is in possession of the land, it has lost its right to appeal. The plaintiff has filed affidavits which aver that long before it instituted the condemnation action it secured "an easement of a right of way" over the land of the defendants-respondents which has exactly the same boundaries as the strip mentioned in the condemnation action. The affidavits explain that the easement has never been terminated and that the purpose of the condemnation action was to "condemn a greater interest." The affidavits state that, in order to simplify the award of damages, the plaintiff agreed that the amount to be assessed by the jury should not be lessened by the easement.

Since the plaintiff's right in the property, in the nature of a railroad right of way, has never been terminated and remained unaffected by the condemnation action, the plaintiff was warranted in remaining in possession even after the entry of judgment and the giving of notice of appeal. Therefore, its conduct since notice of appeal was given is not inconsistent with its challenge of the judgment.

The motion to dismiss is denied.

*Norman J. Wiener,* Portland, argued the cause for appellant. With him on the briefs were King, Miller, Anderson, Nash & Yerke, Portland.

*Walter H. Evans, Jr.,* argued the cause for respondents. On the brief were Krause & Evans and Jack L. Kennedy, all of Portland.

Before WARNER, Chief Justice, and ROSSMAN, LUSK, BRAND, PERRY and McALLISTER, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff from a judgment, based upon a verdict, which the circuit court entered in an action instituted by the plaintiff to condemn and acquire an easement of right of way over land owned by the defendants. The strip of land which the plaintiff sought was roughly 80 feet wide and aggregated 2.62 acres. The action was based upon ORS 376.505 through 376.540. *Oregon Mesabi Corporation v. C. D. Johnson Lumber Corporation,* 166 F2d 997. The issue as to use and necessity was tried by the court without a jury and resulted in the entry of an order in favor of the plaintiff which is not attacked upon appeal. Then the issue of compensation was sub-

mitted to a jury which returned a verdict of $4,026.20. Following the filing of the verdict, the judgment challenged by this appeal was entered.

After the institution of this proceeding the C. D. Johnson Lumber Corporation, which had filed this action, and three other corporations through an agreement of merger, created a corporate entity entitled Georgia-Pacific Corporation which succeeded to all of the rights and properties of its four predecessors. It has been substituted as the plaintiff-appellant. The defendants-respondents are Tim Miller and his wife, Myrl F. Miller, who are the owners of the land involved in this proceeding.

The appellant presents the following two assignments of error:

1. "The court on examination of witness Tim Miller, one of the respondents herein, erred in failing to sustain appellant's motion to strike his testimony relating to the depreciated value of the remainder of the tract of respondents' land over and across a portion of which appellant sought to condemn an easement of a right of way for a logging railroad."

2. "The court erred in denying appellant's motion for a new trial."

Appellant's brief explains:

"This second assignment of error raises only one new issue of law not already raised in the first assignment of error. That issue is:

"The verdict of the jury was against law in that there was no competent evidence of market value of said strip of land or of any depreciation in market value of the remainder of respondents' tract to warrant a verdict in the sum of $4,026.20."

Prior to the aforementioned merger, the C. D. Johnson Lumber Corporation operated a lumber plant in Toledo which secured its logs from a tract of timberland in the Upper Siletz River gorge. The logs were brought to the plant upon a logging railroad owned and operated by the company. Beyond the end of the railroad lay a part of the Siletz Reservation, including a tract of 160 acres of which an Indian by the name of Leo Umatata was the beneficial owner. The title to his tract was held by the United States Government in trust for him under the General Allotment Act of 1887, 24 Stat 388 as amended.

In 1941, about eleven years before this proceeding was begun, the Johnson Company wished to extend its logging railroad about twelve miles. The contemplated extension would cross a part of Umatata's land. March 19, 1941, the Johnson Company applied to and, July 25, 1941, received from the Secretary of the Interior, through the medium of an instrument which spoke of a "revocable permit," leave to cross Umatata's land. The instrument required the payment annually of $36.74. Umatata's land was only one of several tracts owned by Indians which the contemplated extension would cross. After the leave of July 25, 1941, was received, the extension was built and thereupon the logging trains used it. August 27, 1951, pursuant to his application, the United States issued to Umatata fee patents to his allotted land and September 19, 1951, Umatata conveyed it to the defendant, Tim Miller, a white man. Miller had long known of the railroad and knew that it crossed the 160-acre tract. In August, 1952, Miller posted No Trespass signs on the railroad tracks at the places where they crossed his land and in other ways asserted absolute ownership over the entire tract.

From the above, we observe that when this proceeding was instituted September 2, 1952, the railroad was already upon the land. However, under stipulation of the parties, in the assessment of compensation, no account was taken of the rights, if any, which the plaintiff had in the land.

We will now consider the assignments of error.

Defendant-respondent Tim Miller, to whom we will refer as Miller, was the only defense witness. By virtue of the facts that he owned the tract in question, was familiar with it and had had many years of logging experience, he qualified, under familiar rules, as an expert witness on the question of the amount by which plaintiff's use of the right of way depreciated the value of his remaining, now divided, tract. He testified that, in his opinion, his remaining land had been depreciated in value by a sum in excess of $12,000. Upon cross-examination, some of the bases of that figure were elicited by plaintiff's counsel:

"Q Now, in arriving at that figure, Mr. Miller, I'd like to inquire whether or not you included in that an element of fire hazard?
"A Yes.

"Q You think the property has depreciated because of fire hazard?
"A Yes, sir.

"Q Now, I'd like to further inquire whether or not in arriving at that figure of $12,000, did you consider as an element possible losses from fire in the future which may be caused by carelessness of hikers or campers or fishermen?
"A Partly and partly from the locomotive is the most dangerous; the train is dangerous.

"Q But you included the element that I have mentioned, that is, the possible losses from fire in

the future caused by carelessness of hikers or campers or fishermen?

"A That's right. And the fire insurance is higher on it.

"Q You also included fire insurance?

"A I say your fire insurance is higher, rates will be higher if you was to get fire insurance on the property."

Plaintiff's motion to strike the testimony segregated the three allegedly improper elements: fires in the future, fires caused specifically by campers or fishermen, and increased cost of fire insurance. For convenience, these will be treated individually.

■ Plaintiff first contends that the risk of future fires resulting from negligent operation of its locomotives is an improper element in estimating the depreciation in value of defendant's tract. Plaintiff has not cited any portion of Miller's testimony in which he based his estimate upon future negligence in the operation of the trains. There is none. In response to queries on cross-examination, Miller testified that he thought the value of the property had depreciated because of fire hazard and that the danger of fires set by trains was "the most dangerous." It is significant that, in its instructions to the jury, the court specified that fire hazard could only be considered if it depreciated the value of the remaining tract and that "any possible damage which may result from negligence in the use of the right of way by plaintiff" was not to be considered. 2 Lewis on Eminent Domain, 3rd Ed, § 740, p 1314, states the rule as follows:

"When a part of a tract is taken for railroad purposes, danger from fire to buildings, fences, timber or crops upon the remainder, in so far as it

depreciates the value of the property, may properly be considered.''

In 1 Orgel, Valuation under Eminent Domain, 2d Ed, § 63, p 288, it is said:

"The courts have constantly held, for example, that the extra fire risk resulting from construction of a railway property on the owner's land shall be taken into account, and in only a few of the opinions has the court suggested that the amount of the risk shall be estimated as if it were certain that the railway would not operate its locomotives negligently.''

*Idaho & W. R. Co. v. Coey,* 73 Wash 291, 131 P 810; *Texas Midland R. Co. v. Burt* (Tex Civ App), 243 SW 669; *Chicago, I. & L. Ry. Co. v. Ader,* 184 Ind 235, 110 NE 67; *Raleigh, C. & S. Ry. v. Mecklenburg Mfg. Co.,* 169 NC 156, 85 SE 390. See, also, *Oregon and California Railroad Co. v. Barlow,* 3 Or 311, and *Oregon Mesabi Corp. v. C. D. Johnson Lumber Corp.,* 166 F2d 997.

Plaintiff cites as the next improper element of depreciation in value Miller's affirmation of counsel's suggestion relative to fires caused by the carelessness of "hikers or campers or fishermen." The efforts of counsel have brought to light no cases bearing on the question of increased fire hazard brought about by the more convenient access to an area made possible by the building of a railroad. Plaintiff has submitted two cases which disallowed as remote and speculative the contention that the railroad would bring tramps into the area who would (1) lodge in a barn seen "over the top of the corn," and (2) increase the risk to an orchard. *Louisville & N. R. Co. v. Hall,* 143 Ky 497, 136 SW 905; *The Kansas City & Emporia R. R. Co. v. Kregelo,* 32 Kan 608, 5 P 15.

In the instant case the jury was instructed "not to take into consideration remote or speculative damages," and cautioned that all damage "must be actual, real, and supported by the evidence." In addition to Miller's testimony, the testimony of plaintiff's witness, Floyd Blackburn, a man with logging experience dating back to 1906, employed at the time of trial by the Valsetz Lumber Company, could have been considered by the jury as having bearing on this point:

"Q  Does the Valsetz Lumber Company own any private truck roads?
"A  Yes.

"Q  And do they maintain them open to the public, to hunters and fishermen during the summer?
"A  Not when the humidity is—when the Governor would close it if it's down, but otherwise it's open at all times.

"Q  You leave it open at all times?
"A  Open at all times.

"Q  You don't lock the private roads?
"A  Not unless they are down for humidity.

"Q  I mean other than the period of time when the Governor declares a closure?
"A  Yes.

"Q  Then I take it you do not consider the traveling public as a source of fire hazard?
"A  We watch them when they are in there fishing. We have men there and they don't go in certain places with their cars, and we take them up and bring them back, and if they tell us we go up and bring them up and bring them back but we don't let them run in our area.
*  *  *  *  *

"Q  Isn't it a fact, Mr. Blackburn, that by far the greatest percentage of forest fires are man made or of human origin?
"A  That's what I read.

"Q  Don't you believe that too?
"A  Yes."

■ In the light of such testimony it cannot be said that the element under consideration was so remote or speculative as to be removed from the consideration of the jury.

Finally, plaintiff contends that Miller's inclusion of higher fire insurance rates as an element in estimating the depreciation in value of his remaining land was erroneous. Plaintiff quotes from 2 Lewis on Eminent Domain, 3rd Ed, § 740, p 1315:

"It is to be borne in mind that compensation is not to be given for increased exposure to fire, nor for increased insurance rates, nor for probable losses by fire in the future for which no recovery may be had, *but simply for depreciation in the value of the property by reason of the danger from fire.*"  (Italics added)

Plaintiff failed to note footnote 84 on that page:

"But the contrary is held in the following on the ground that *increased insurance rates would affect the value of the property.*"  (Italics added)

This rule is also set forth in 29 CJS, Eminent Domain, § 170, p 1040:

"It is not the purpose to provide an indemnity against loss by fire, any loss or destruction by actual fire being recoverable, if at all, after that event by separate action, nor to compensate the owner for any supposed increase in the rate of insurance which he will have to pay; but when part of a tract is taken for such a use that buildings on the remainder are placed in danger of fire, which will render the cost of insurance of the property greater than before the taking, this fact may be taken as an element of the damages if the hazard is sufficient to cause a decrease in the market value of the property."

■ Well-reasoned authority supports this view. *Esclick v. Mason City & Ft. D. Ry. Co.,* 75 Iowa 443, 39 NW 700; *Cedar Rapids, Iowa Falls & Northwestern Ry. Co. v. Raymond,* 37 Minn 204, 33 NW 704. *North Arkansas & Western Ry. Co. v. Cole,* 71 Ark 38, 70 SW 312, cites the two foregoing cases and discusses the question at length. In that case, the landowner claimed that the value of his barn had been lessened because of the increased risk of fire brought about by the passing trains. The railroad offered to prove that the landowner's fire insurance rates would not be raised as a result of the introduction of the railroad. This offer was rejected by the trial court, and, citing this as error, the judgment was reversed. The court said:

"* * * compensation is not given for increased exposure to fire, nor for increased insurance rates, nor for probable losses by fire in the future, but simply for depreciation in value of the property by reason of the increased danger from fire. Any fact resulting from the construction of the railroad, and bearing directly on the market value of the property, where not forbidden by the policy of the law, may be considered by the jury in deciding the effect of the construction of the road upon the market value of the property. Among other things, they have the right to consider the increased exposure to fire, if proved; and we see no reason why they should not be permitted to consider the effect of this exposure on the rates of insurance for the property. Whether or not the rates of insurance were increased is a matter about which most purchasers would wish to be informed, and would seem to be a fact tending more or less to affect the market value of the property."

■■ The test to be applied upon a question of the validity of an alleged element in the depreciation of land value, then, is whether it would tend to give a pros-

pective buyer pause and, on that account, seek a lower purchase price. It cannot be said that a prospective purchaser would disregard (1) the increased hazards of fire arising from the presence of the railroad and the ensuing increased likelihood that third persons will visit the property, and (2) the resulting prospect of higher fire insurance rates. That being so, an evaluation including those items was properly submitted to the jury.

We believe that the two assignments of error lack merit.

The challenged judgment is affirmed.